[Filed July 2, 1892.]

GEORGE W. WIMER ET AL. v. ANNA F. SMITH ET AL.

IMPEACHMENT OF WITNESS—WEIGHT OF EVIDENCE.—To show that the reputation of a witness for truth and veracity is bad, does not of itself entirely destroy his testimony where it is intrinsically probable or is corroborated by other evidence. Under such circumstances it must be considered for what it is worth with other evidence; but where it is not supported, it may be utterly disregarded.

WEAKER EVIDENCE—PRESUMPTION OF DISTRUST.—If weaker and less satisfactory evidence be offered when it appears that stronger and more satisfactory was within the power of the party, the evidence offered should be viewed with distrust.

FRAUD—FALSE REPRESENTATIONS—JUDGMENT OF PURCHASER.—A party seeking relief on the ground of fraud perpetrated upon him by means of false representations, must not only clearly prove the fraud, but must also show that he relied upon the false representations; and although such false representations were made as alleged, yet, if, having full means of knowing the truth, he acted on his own judgment in the transaction from which he seeks relief, he cannot complain.

Josephine county: L. R. WEBSTER, Judge.

Defendants appeal. Affirmed.

*S. U. Mitchell,* and *C. W. Cross,* for Appellants.

The measure of defendants' damages, which they are entitled to recover, is the difference between the value of the property as it was represented to be, if the material misrepresentation were true, and the value of the property, with the matter of misrepresentation false. (*Harvey* v. *Hadley*, 87 Cal. 557.)

One who has been drawn into executing a contract by fraudulent representations may affirm the contract after the discovery of the fraud, and notwithstanding such affirmance may sue for the fraud, or may recoup the damages sustained on account of it in an action by the other contracting party on the agreement. (*Whitney* v. *Allaire*, 4 Den. 554; *King* v. *Boston*, 7 East, 481; *Cormack* v. *Gillis*, id. 480; *Kellogg* v. *Denslow*, 14 Conn. 411; *Boorman* v. *Jenkins*, 12 Wend. 566; *Waring* v. *Mason*, 18 Id. 426; *Hoggins* v. *Becraft*, 1 Dana, 30; 2 Kent's Com. 5th ed. 480; Long on Sales, by Rand, 213, 219, 240; *Weston* v. *Downes*, Douglass, 23; *Towers* v. *Barrett*, 1 T. R. 133; *Payne* v. *Whale*, 7 East, 274; *Crown* v. *Carriger*, 66 Ala. 590; *King* v. *Doane*, 139 U. S. 166.)

If a false representation of a material matter of fact, not patent and open to the buyer's inspection, be made by a party proposing to sell, and the buyer, induced by such representation and relying on its truth, accepts the offer and closes the trade without knowing the falsity of the representation, and is thereby deceived to his injury, the seller shall make good the representation. (*King* v. *Doane*, 139 U. S. 166.)

Fraud will vitiate a contract; but where the parties to it stand upon an equal footing, the fraud must consist of a false representation of a material fact, and the party to whom it is made not be able by the exercise of reasonable caution and vigilance, to detect its falsity. (*Fahie* v. *Pressey*, 2 Or. 23; 80 Am. Dec. 401.

Fraud, accident, or mistake must appear, or equity will not relieve from ignorance of fact. (*Rolfes* v. *Russel*, 5 Or. 400; *Horrelt* v. *Manning*, 6 Or. 413; *Smith* v. *Griswold*, Id. 440.)

For the essential allegations in complaint for false representations, see *Smith* v. *Cox*, 9 Or. 327.

Knowledge of the falsity must be alleged and proved in action at law. (*Willamette Co.* v. *Gordon*, 6 Or. 175.)

They must have been asserted as facts, and not opinions, and have been known untrue in an action at law. (*Caples* v. *Steel*, 7 Or. 492.)

If the fraud be such that, had it not been practiced, the contract could not have been made, or the transaction completed, then it is material to it. (*Jackson* v. *Armstrong*, 50 Mich. 65.)

One who obtains land in a trade, and before doing so goes upon and looks at it, has nevertheless a right to show that he was misled by the representations of the other party. (*Fishback* v *Miller*, 15 Nev. 428.)

The rule of *caveat emptor* applies only when buyer and seller have equal opportunities of knowledge, and where the defect complained of is patent and obvious to the senses. This was a case where, in a sale of an interest in a mine, the depth of a shaft and the size of a ledge in the bottom of the shaft, were misrepresented by a vendor. (*Smith* v. *Richards*, 13 Pet. 26, 2 Parsons, Cont. 773.)

If, however, the plaintiff mainly and substantially relied upon the fraudulent representation, he will have his action for the damage he sustains, although he was in part influenced by other causes. (*Safford* v. *Grout*, 120 Mass. 20.)

In an action for false representations, it is sufficient if such representations materially influenced the conduct of the plaintiff, though they were not the sole predominant inducement. It is not necessary that the false representations should have been the sole or even the predominant motive; it is enough if they had material influence upon the plaintiff, although combined with other motives. (2 Pom. Eq. Jur. §§ 873–904.)

P. P. Prim & Son, and H. K. Hanna, for Respondents. .

The alleged misrepresentations and fraud set up in defendants' answer being denied by the plaintiffs, the burden of proof rests on the defendants to establish them to the satisfaction of the court by a preponderance of the evidence, and failing in this, the whole of said defense should and must be disregarded and held for naught. (Greenl. Ev. § 74; *Stevenson* v. *Marony*, 29 Ill. 532; *McClure* v. *Pursell*, 6 Ind. 330.)

The purchaser is not justified in relying on the vendor in any of the following cases: (a) When before entering into the contract the purchaser actually resorts to the proper means of ascertaining the truth and verifying the statements made by the vendor, as was done in this case by Wadleigh; (b) when having an opportunity of making such examination, the purchaser is charged with all the knowledge which he would and could have obtained if prosecuted with diligence; (c) when the means of acquiring the true condition of the subject matter of the purchase is equally in the possession of both parties. (2 Pom. Eq. §§ 890–893; *Slaughter's Admr.* v. *Gerson*, 13 Wall. 379; 3 Wait's A. & D. 441; *Johnson* v. *Taber*, 6 Seld. 319.)

Prompt disaffirmance of the contract is required of the party deceived by misrepresentations upon the discovery of the fraud. (2 Pom. Eq. § 897.)

The defense is based upon alleged false representations, made by the vendors, to induce Wadleigh to purchase the property, and not upon any attempt at concealment or to prevent a thorough investigation of the true condition and situation of the mine. Where the purchaser relies upon fraudulent representations to prevent inquiry, the means by which he has been induced to forbear inquiry, must be specially alleged as well as proved. (*Parker* v. *Moulton*, 114 Mass. 99; 19 Am. Rep. 315.)

LORD, J.— This is a suit to foreclose a mortgage, executed and delivered to plaintiffs by the defendant Anna F. Smith through the defendant W. I. Wadleigh, her duly authorized attorney in fact, conditioned for the payment of six promissory notes of the same date, and described in the complaint; and also for the payment of reasonable attorney fees. It is alleged that these notes were executed and delivered to the plaintiffs as aforesaid for the payment of thirty-eight thousand one hundred and sixty-eight dollars and ten cents, the same being the amount of a balance due and unpaid by the defendant Anna F Smith on the purchase price of certain mining properties and water ditches connected therewith, set out and described in the complaint and mortgage, which had been sold and duly conveyed by the plaintiffs to the said Anna F. Smith, through her said attorney in fact, about two years prior thereto.

The defendants answered admitting the execution of the notes and mortgage, based on the consideration alleged in the complaint; but as a defense to the enforcement of said notes and mortgage, alleged that the defendant Wadleigh had been induced to purchase the mining property, ditches, etc., at the agreed price of seventy thousand dollars, by false and fraudulent representations as to the grade upon which the upper and most valuable portion of said mining grounds in Butcher gulch, in the vicinity of Simmons' shaft, could be mined and worked by hydraulic process; that the said Wadleigh relied upon said false representations in making said purchase, and that all of said upper portion of Butcher gulch was worthless, for the reason that it could not be bottomed and worked by means of hydraulic pipes and giants in the represented grade; and that by reason thereof the defendants had been damaged in the sum of sixty-one thousand five hundred and two dollars and fifty-eight cents, for which they asked a decree against the plaintiffs. These affirmative allegations of the answer were put in issue by the denials of the reply.

To aid in the explanation of the case, there are some facts which need to be outlined that are not disputed. It appears from the evidence that the plaintiffs were the owners of the mining grounds and ditches connected therewith situated near Waldo in Josephine county, commonly known as the Wimer mines; that W. I. Wadleigh, an experienced hydraulic miner, visited that country and place in the month of May, 1888, in company with a man by the name of Thomas Bailey, for the purpose of prospecting and purchasing some gravel mines; that while there, meeting with George W. Wimer, one of the plaintiffs, their attention was attracted to the Wimer mines, and negotiations were commenced for the purchase of the same; that while such negotiations were in progress, the said Wadleigh, assisted by the expert Bailey, spent several days in examining and prospecting the mining grounds and ditches, and on the twenty-second day of May, 1888, thereafter, he made an oral agreement with George Wimer to purchase the same for the agreed price of seventy thousand dollars, and at that time gave his check to George W. Wimer for two hundred and fifty dollars to bind the bargain; that between the twenty-second day of May, 1888, and the eighteenth day of July, 1888, the defendants paid on the purchase price of said mine the sum of thirty-four thousand four hundred and fifty dollars, including two thousand two hundred dollars allowed as discount; that on the last date aforesaid a written memorandum of agreement was entered into between the plaintiffs and defendant Anna F. Smith by her attorney in fact, W. I. Wadleigh, by which, *inter alia,* she agreed to execute and deliver certain promissory notes for the balance due on the purchase price of said mine; and to secure the payment of the same, she agreed to execute and deliver to plaintiffs a good and sufficient mortgage on said mining grounds and certain improvements thereon; that in pursuance of said agreement, the notes and mortgage aforesaid were executed and delivered

and that during all the times from and after July, 1888, up to the time of the commencement of this suit, the defendants have been in possession of and working said mining property.

The defense is based upon fraudulent representations, alleged to have been made by the plaintiffs to induce Wadleigh to purchase the mining property. These alleged false representations being denied by the plaintiffs, the burden of proof rests upon the defendants to establish them by a preponderance of the evidence. The counsel for the appellant recognizes this as the correct rule of law, applicable to the issue, and that the main question in the case is, as to whether George W. Wimer did or did not make the fraudulent representations alleged. The facts show that Wadleigh, acting as the agent for his sister, Anna F. Smith, conducted all the negotiations on behalf of the defendants, and that George W. Wimer, as the agent for himself and Wm. J. Wimer, conducted all the negotiations for the plaintiffs. Wadleigh testified that George W. Wimer made the fraudulent representations alleged, and George W. Wimer testified that he did not make such alleged misrepresentations. It is admitted that if the evidence of these two witnesses is entitled to equal credit, there is no preponderance of evidence, and the defense set up must fail.

The contention for the appellant is, that where two witnesses swear directly contrary to each other, and one of them is impeached by evidence that his general reputation for truth is bad, the preponderance of the evidence is then in favor of the other party. To effect this result, or to make the evidence preponderate in support of the allegation of fraudulent representations, the defendants have sought to impair the value or weight of the testimony of George W. Wimer by evidence that his reputation for truth is bad. Quite a number of witnesses who had been the neighbors of the defendant George W. Wimer several years

before, at the time of, and after the alleged purchase of the mining property, testified that they were acquainted with his reputation for truth in the neighborhood where he had resided, and that it was bad. To sustain his reputation, the plaintiffs introduced quite a number of witnesses; but the large majority of them never resided in the vicinity where the Wimers resided when the transaction occurred, or their residence near them was at some period antedating the trial many years. Some one or two others testified that his reputation for truth was good. It must, however, be noted that some of the witnesses, introduced by the defendants to impeach the reputation of George W. Wimer, were hostile in feeling toward him; and some one or two were objectionable in other particulars, which need not be noted in detail. Still, it is quite probable, judging from the evidence in the record, that his reputation for truth in the community where he had resided when the mining property was sold, was bad among his neighbors; and if the case depended entirely upon his testimony, considered apart from other evidence or circumstances in the case, we might feel bound to disregard it.

In considering the weight to be attached to the testimony of an impeached witness, the rule is the same in equity as at law In either case, the only object of an inquiry into the character of a witness is to ascertain whether his statements are entitled to credit. In equity, the facts constituting fraud are found by the court; but a court of equity is not justified in finding such facts upon any less or different kind of proof than would be required to satisfy a jury. Where the facts depend entirely upon the testimony of an uncorroborated witness, whose credibility is plainly impeached, a court or jury would be authorized to disregard his testimony; but even where it is shown that a witness has a bad reputation for truth, his evidence is not necessarily destroyed, but is to be considered under all the circumstances described in the evi-

dence, and given such weight as the trial tribunal believed it entitled to. "Such witnesses," said BEASLEY, C. J., "are to be relied on in any judicial proceeding, only so far as their testimony is intrinsically probable, or is corroborated by circumstances." (*Adams* v. *Adams*, 17 N. J. Eq. 334.) So that a court is not bound to disregard the evidence of an impeached witness, but it should be compared with the other evidence and facts proved in the case, and given such weight as it is entitled to under the circumstances. The only evidence tending to prove the alleged false representations in the sales of the mining property is that of the defendant Wadleigh himself. He swears that the plaintiff George Wimer made such false representations to him at Waldo during the negotiations of the trade, in the presence of Thomas B. Bailey, his mining expert; but George Wimer swears directly and positively that he made no such representations to him. The burden of proof is on the defendants; and it is indispensable to their defense that the false representations charged should be proved. It is clear, if such representations were made in the presence of Bailey, in view of their materiality and importance, that he would be likely to have a distinct recollection of them, and would be able to give such evidence in respect to them as would corroborate the testimony of Wadleigh on this vital matter. Yet Wadleigh did not produce his evidence at the trial, nor is there any showing of any effort made by him to procure it by deposition, or otherwise, or to account for its absence, notwithstanding Bailey resided in the adjoining State of California, and the place of his residence was known to the defendant Wadleigh.

Under such circumstances, having failed to produce Bailey's evidence in corroboration of his own evidence in a matter of such vital importance to his defense, is not the court authorized to draw the inference that Bailey's evidence, if produced, would be adverse to him, or would be corroborative of the testimony of the plaintiff Geo. Wimer?

In law, the jury may draw unfavorable inferences from a party's failure to call witnesses who have knowledge of material facts. Even in criminal cases, a failure to produce proof, when in the power of the party, is recognized as proper to be considered by the jury. The case of *Seward* v. *Garlin*, 33 Vt. 592, tends to illustrate the principle involved. There, the court, in commenting upon the course a party would be ordinarily expected to pursue when he had a witness by whom he could support his own testimony upon a material point, said, by POLAND, C. J.: "Clearly nothing else than that he should call such witness to give his testimony in corroboration of his own. Any failure to do this could hardly happen without some motive; and in the absence of any other being shown, the almost irresistible conclusion would be that he feared at least that the witness would not support his other testimony, and thus have the effect to create more or less doubt and discredit of such party's case." (*Whitney* v. *Bailey*, 4 Allen, 173.) SHERWOOD, C. J., said, in *Baldwin* v. *Whitcomb*, 71 Mo. 658, that "the presumption which such a failure to introduce testimony produces is always unfavorable toward the party thus failing, as numerous authorities show." And in that case, it was held that the failure of a party, against whom fraud is charged, to produce as witnesses persons who are alleged to have participated in the fraud, and who are within reach, will raise a presumption in favor of the charge. (Bump, Fraud. Conv. 53.) Of course, what effect is to be given to the failure of a party to produce such evidence, would depend upon all the circumstances of the case; but when wholly unexplained, it is a matter to be considered, and such effect given to it as the court or jury should deem it entitled to.

It is alleged and claimed that the most valuable portion of the mining property is located about the upper portion of what is known as Butcher gulch, and that there was at the time of the sale a shaft sunk near the center of it

known as Simmons shaft, sixty feet deep to bedrock. Wadleigh testifies that Wimer represented during the progress of the negotiations that the flumes, when continued to the Simmons shaft on the established grade of one and one-fourth inches to the box, would strike the Simmons shaft four feet in the bedrock, and that the whole of the upper portion of Butcher gulch could be worked off with pipes and giants; that two competent surveyors had ascertained and reported to the plaintiffs that the grade line of said flume would strike four feet lower than the bottom of Simmons shaft; that he believed such representations, and relied upon them when he made the purchase of the mining property in question, when the fact was, as he subsequently discovered, and George Wimer well knew, that the upper portion of Butcher gulch could not be bottomed and worked on the established grade of their flume. In all other particulars, the testimony of Wadleigh and Wimer substantially agree. Wadleigh admits (as Wimer testifies) that Wimer was sick, confined to his room, and unable to show Bailey and him the mining property; but that he told them to go to the foreman in the mine, obtain pick, shovel, and pan, and investigate and prospect for themselves. It is clear that every facility was afforded them to examine the property and satisfy themselves in respect to to it. Before purchasing the property, they spent several days in making the examination, and prospecting it. The Simmons shaft was in plain view, but they did not prospect any of the gravel in that vicinity. They were both experienced miners, especially Bailey, who is an expert, and understood the hydraulic requisites of such a mine. Upon the established grade, it is conceived that it would not have been a difficult task to ascertain whether, when extended to the Simmons shaft, it would strike four feet in the bedrock or seven feet above it; but Wadleigh testifies that he "made no examination of the shaft. I found it full of water; I couldn't get in it; I found it so the second

day; it was full up to the boards,—right up,—never was otherwise." Upon this matter, so material, he accepted and relied upon the statements of George Wimer, when he made the purchase. Wimer testifies that he never made such representations; that, so far as he could, he afforded Wadleigh and his expert, Bailey, every facility to examine the mine; that "he made no representations whatever, for he didn't ask me about it, there was nothing said about the shaft—nothing at all. I wasn't out of bed while he was there, that is, to be out of my room. · * * * I told him to go prospect until he was satisfied; that the boys would show him the mines, where to prospect, and show him the locations," etc. In a word, the effect of his evidence is that Wadleigh purchased the mine after several days' examination of it, upon his own judgment, and without relying upon the representations of any one. As to the leveling made by the two engineers, Wimer testifies: "I don't know anything about that survey at all. * * * I wasn't in the country." Q.—"There has been some evidence offered that a survey was made for your father, after you had entered into possession, and Simmons, made by the younger Howard, or leveling made to the Simmons shaft by him. Did you ever know, or did any one ever tell you what the result of that leveling was?" A.—"No, sir; he never told me anything about what the result of it was. I never had any level made, and I never heard anything about it."

Howard, one of the engineers, to whom this evidence refers, testifies that his notes show that the mine was owned by J. Wimer and sons and George Simmons when he made the survey. He does not remember whether he made a written report, or reported the result of his survey orally; that according to the survey then made, an inch and a quarter grade would bring the flume nine feet above the bedrock. This evidence is not absolutely irreconcilable with George Wimer's testimony that he did not know any-

thing about the survey, or the result of it; but conceding he was constructively charged with notice of it, or did know it at the time of the purchase, still the fact is not to be overlooked that the allegation is not for the concealment of the result of that survey, but the active misstatement of it. There is, however, the testimony of one or two witnesses as to conversations which they had with the plaintiffs when they were working the mine and before any sale of it was on foot, to the effect that the plaintiffs represented to them that the surveys made by the Howards,—father and son,— substantially agreed; that Simmons was telling it that the ground referred to could not be bottomed on the established grade, but that these surveys made for them showed that the flume grade was four feet in the bedrock, and that it could be bottomed; hence Simmons was telling an untruth. It seems that Simmons was formerly a coöwner with the plaintiffs in the mine, and between whom and them, for some cause, a good deal of bad feeling existed. It is claimed that this evidence shows that they knew that the statements of Simmons were true, and that they misrepresented those surveys to refute them, and to establish a false estimate of the value and nature of their mining property; hence their evidence is not to be relied upon, but distrusted; nor are they to be regarded as credible witnesses.

Conceding that this phase of the case tends to impugn and assail the plaintiff's regard for truth, and indicates a disposition that would not hesitate to make the alleged mis-representations to induce an advantageous bargain or sale, still, if Wadleigh was cognizant of the matter alleged when he bought the property, or did not rely upon them, he cannot now be heard to complain. The evidence shows that during the negotiations for the purchase of the property, and some time prior to the execution of the notes and mortgage, Wadleigh was informed by Simmons that he was the man who sunk the Simmons shaft in the upper portion of Butcher gulch; that the same was sixty feet deep to the

XXII OR.—31.

bedrock, and could not be bottomed on the grade on which plaintiffs' flume was established. Here was direct and positive information in regard to a material matter, the truth of which he could have easily ascertained before the sale was closed, and which constitutes the ground of the alleged misrepresentations. This information did not come from a stranger, nor was it of a speculative character—it came from one who had been a part owner, who sunk the shaft, and whose knowledge of the facts gave significance to his statement; yet Wadlegh paid no heed to it, because, as he states, the plaintiffs had predjudiced his mind against Simmons. Ordinarily, it would be expected, in making a contract of such magnitude as this, that the purchaser would require the vendor to put in writing his representations inducing the sale, and to agree to refund the purchase money, or so much of it as would be just, if those representations proved to be untrue. No such thing was done by the memorandum of agreement entered into between them, notwithstanding the information imparted by Simmons. This precaution would have avoided this litigation; but Wadleigh not choosing to do this, and taking no heed of Simmons' information, this suit is the result; and when he is called upon to prove the alleged false representations, made in the presence of and only heard by one other person except himself and George Wimer, who denies them, he omits or fails to produce the evidence of this man whose testimony ought to be decisive of the truth between George Wimer and Wadleigh. Nor is this all. Wadleigh went into possession in July, 1888, and, in August succeeding, he procured Alexander Watts to make a survey for him from the end of plaintiffs' flume to the Simmons shaft, and aided him in making the survey. Watts reported to him that when the flume was extended up to the Simmons shaft on the established grade, it would strike about seven feet above the bottom of said shaft. But despite this information, he remained in the possession of the mine and operated it as

a hydraulic mine nearly two years prior to the execution of the notes and mortgage, which are the foundation of plaintiffs' cause of suit, without making any complaint. On the contrary, during the whole of this period, the record discloses that he wrote many letters eulogistic of the wealth of the mine, and his complete satisfaction with his purchase. As to the delay in not paying the notes, he assures the plaintiffs that he is "good for the full balance due"; that they "need not worry about the property"; that "I am making arrangements to pay the debt, and shall then ask cancellation of the mortgage," and that "there will be no attempt to throw the claim back upon your hands."

These facts tend strongly to show that Wadleigh was cognizant of the matters complained of; that if Simmons' information as to the shaft was not enough to attract his attention to it, surely Watts' survey confirming it could not be ignored, or fail to excite his suspicion of the fraud alleged, as that survey was made at his own suggestion and aided by him, and imparted information absolutely inconsistent with the alleged misrepresentations; yet, in the face of this information and knowledge, he did not disaffirm the contract, but continued in the possession of the mine, working and taking money out of it for a long period thereafter without the sign of a complaint, until the present suit was threatened to enforce the payment of the notes and mortgage given for the balance due for such property.

In *Vigers* v. *Pike,* 2 Dr. & W. 1; S. C. 8 Clark & Finn. *562, a bill was filed to compel payment of a residue of the purchase money due on a lease of mines, which the defendants had entered upon and worked for three years. The defendants filed a cross-bill for relief on the ground of misrepresentation and fraud, which was dismissed; and upon appeal taken to the house of lords, the decree was affirmed, the chancellor, Lord Cottenham, saying: "In a case depending upon alleged misrepresentations as to the nature and value of the thing purchased, the defendants

cannot adduce more conclusive evidence, or raise a more effectual bar to the plaintiff's case, than by showing that the plaintiff was, from the beginning, cognizant of all the matters complained of; or after full information concerning them, continued to deal with the property, or even to exhaust it in the enjoyment, as by working the mines."

In the minds of reasonable men, these matters would have been regarded of too vital importance, if they showed false representations, to be ignored or disregarded. When brought to light, as they were, Wadleigh's conduct, under the circumstances, can only be accounted for or reconciled on the hypothesis that those matters constituted no part of his contract; or if they did, and showed that Wimer had been guilty of false representations, he did not rely upon them but was satisfied with his bargain. This conclusion is very greatly strengthened by other evidence tending to show that Wadleigh purchased the mine upon his own judgment, and without relying upon the representations of any one. According to his own statement, Wadleigh was a miner of some experience; and the record discloses that he is a man of much more than ordinary ability. The facts show that he was accompanied by Mr. Bailey, a mining expert, who aided him in the examination of the mine and its water rights; that they spent several days in prospecting and examining it before the sale was consummated, and that the means of obtaining the true condition of the mine was open to them, and every facility afforded to aid them in the investigation, in order that they might satisfy themselves as to its real status. In fact, Wadleigh admits that he bought the mine on his own judgment and Mr. Bailey's, after having thoroughly prospected it. He was asked upon cross-examination: Q.—"Is it not a fact that you did buy this claim on your own judgment, after having made a thorough prospect of it?" A.—"Yes, sir, and Mr. Bailey's judgment." This statement that he bought the mine on

his own judgment, and not on the representations of others, was made to other witnesses with whom he conversed.

Mr. A. K. Russ, who was a miner and witness, was asked: "Did you at any time have a conversation with Mr. Wadleigh relative to his buying the claim, as to whether he bought it on representations, or on his own judgment?" He answered: "Yes, sir"; and when further asked, "State where it was," answered: "We were coming on the stage to Waldo. He wanted me to help harvest his crop, and he told me he had bought the mine. And I said to him, if you had talked to Mr. Wimer's friends perhaps you wouldn't have bought it. He told me, 'I bought the mine on my own judgment; I paid my own money for it, and asked nobody's advice.'" Thomas Jackson, another witness, testified that he told him, "I have thoroughly prospected this property until I am thoroughly satisfied; I know it is good property"; and that he heard him say in another conversation that he wouldn't have invested that amount of money in any property unless he knew what he was doing; that he had thoroughly prospected this before he had bought it; that he did not go into this with his eyes shut or blind. If he bought the property on his own judgment, after he had thoroughly examined it, aided by an experienced hydraulic miner, whom he had taken with him for that purpose, it must have been because the result of their investigation satisfied him as to the true condition of the mine and its value. He "asked nobody's advice"— he did not listen to anybody's warning. When Simmons told him that he sunk the Simmons shaft, and that the ground in the vicinity of it could not be bottomed and worked off by hydraulic process, he paid no attention to it; and when Watts confirmed this information by his survey, it excited no suspicion.

The time and occasion and the means of obtaining a true knowledge of the real status of the mine was there to be availed of. Wadleigh was there, backed by the experi-

enced judgment of Bailey, to aid him in the investigation; and his subsequent conduct and declarations tend strongly to indicate that he and Bailey had availed themselves of these means and opportunities to fully satisfy themselves of the nature and value of the mine, and to cause him to make the purchase on his own judgment, and without relying upon the representations of any one. It seems to us, therefore, when all the facts and circumstances are considered, that there is in them an effect which tends to corroborate the testimony of George Wimer, and render it intrinsically probable. Possibly, the fact may be otherwise;—we can only judge from the record;—but taking it for our guide, the circumstances surrounding the case, viewed in the light of Wadleigh's conduct and declarations, do not seem to furnish the occasion or necessity for George Wimer making any false representations; or if any were made by him, that they were relied upon as an inducement for the purchase.

Even where misrepresentations are made, if a person relies upon his own judgment, when he has full means of knowledge, he cannot complain of such misrepresentation. On a charge of fraud, the burden of proof is on the party alleging it. The defendants must clearly and distinctly prove the fraud or false representations they allege. The law in no case presumes fraud. The presumption is always in favor of innocence, and not guilt. Fraud must be proved, but it may be proved by circumstances from which no other inference but that of fraud can be drawn. The rule is, that when proven by circumstances, they must afford a strong presumption. (*Juzan* v. *Toulmin,* 9 Ala. 662; S. C. 44 Am. Dec. 448.) Circumstances of mere suspicion will not warrant the conclusion of fraud. (*Taylor* v. *Fleet,* 4 Barb. 92; *Clarke* v. *White,* 12 Pet. *178.) "The evidence of it," Chancellor KENT said, "must be clear, strong, and satisfactory." (*Boyd* v. *McLean,* 1 Johns. Ch. *582; *Gillespie* v. *Moon,* 2 Johns. Ch. 585; 7 Am. Dec. 559.) And so likewise said

the learned and eminent DILLON, J., in *Geib* v. *Ins. Co.*
1 Dill. C. C. 443. In no doubtful matter does the court
lean to the conclusion of fraud; it is not to be assumed on
doubtful evidence. If the fraud is not clearly and strictly
proved as alleged, relief cannot be had, although the party
against whom relief is sought may not have been perfectly
clear in his dealings. (*Mowatt* v. *Blake,* 31 L. T. 387.) The
facts constituting fraud must be clearly and conclusively
established to justify the court in finding it; but it may
be proved by the preponderance of the testimony. (Big.
Fraud. 474, 476; Kerr, Fraud & Mis. 384; Bump, Fraud
Conv. 584, 587; Wait, Fraud. Conv. § 281.)

In view of this strictness of proof required in cases of
fraud, and that it must be established by a preponderance
of evidence, it would be difficult for a court, upon the testi-
mony as disclosed by this record, to discover such an
amount of proof as would justify it in finding the neces-
sary facts,—the alleged false representations and reliance
upon them.

It is true, that George Wimer's character for truth and
veracity was impeached by many witnesses; and standing
alone, it might be entitled to little, if any, credit; but there
are other circumstances in the case, and inferences to be
drawn from them, that tend to corroborate his testimony
and give probability to his statements. On the other hand,
Wadleigh's unexplained failure to produce the evidence of
Bailey, so vital to his defense under the circumstances, raises
an unfavorable inference against him, and tends to break
the force of his impeachment of Wimer. According to
Wadleigh's testimony, the alleged false representations were
made by Wimer in answer to his inquiries about the mine;
but his conduct before the sale, and his conduct and declar-
ations after it, viewed in the light of the surrounding cir-
cumstances, tend to show a state of mind neither seeking
nor receiving information from Wimer or others about the
mine. In a word, within the purview of his conduct and

declarations, Wadleigh, aided by the experienced Bailey, was prospecting and examining the mine upon his own responsibility; and when the result of that investigation satisfied them of its nature and value, he bought it upon his own judgment. Hence, there was no occasion or necessity for Wimer to make any false representations; or if any were made by him, Wadleigh could not, consistently with his own testimony, have relied upon them as an inducement for the purchase. The record also discloses that he was in the possession of the mine, working it and taking gold out of it, about two years, without making any complaint or objection. During that time he wrote numerous letters to the plaintiffs, in which he highly praised the mining property and its prospects; assured them of his expectations to pay for it out of other property he expected to sell, described the work he was doing, and various other things, difficult to reconcile with any deceit or false representations that induced him to purchase it. It was not until Wadleigh was notified that the plaintiffs could wait no longer for the payment of the notes, that he made any complaint. When he was notified that the notes must be paid or that they would be compelled to foreclose the mortgage, he claimed that the purchase had been induced by false representations, upon which he relied, by reason whereof they had been enabled to perpetrate a fraud. While Wadleigh denies that the threatened enforcement of payment had anything to do with his conduct in this regard, in view of the facts, we think the circumstance deserves to be noted.

It results that we do not think the evidence sufficient to warrant or justify us in finding the defense to the enforcement of the mortgage proved.

The decree must be affirmed.