## C. F. Jewett Publishing Company *vs.* Benjamin F. Butler.

Suffolk.    March 17; 1893. — October 19, 1893.

Present: Field, C. J., Allen, Holmes, Knowlton, Morton, Lathrop, & Barker, JJ.

*Contract — Breach — Validity — Justification.*

A., as the party of the first part, and B., as the party of the second part, executed a contract for the publication by B. of a work to be written by A. "in the nature of autobiography, or reminiscences of his life, and the acts and doings of other public men so far as they may seem to him to elucidate the history of the country or public affairs"; and containing the following clause: " The party of the first part agrees to accept full responsibility of all matter contained in said work, and to defend at his own cost any suits which may be brought against the party of the second part for publishing any statements contained in said work, and to pay all costs and damages arising from said suits." *Held,* in an action by B. against A. for breach of the contract, that the contract was valid. Lathrop, J. dissenting.

A doubt by one party to a contract as to the solvency of the other party will not justify the former in refusing to perform the contract.

That the president and manager of a corporation which bears his name has been guilty of criminal misconduct will not justify a person, who has entered into a contract with the corporation, in refusing to perform the contract, on the ground of the disgrace attaching to the name of the corporation in consequence of such misconduct.

Contract for the breach of an agreement in writing, executed by the defendant as the party of the first part, and by the plaintiff corporation by C. F. Jewett, President, as the party of the second part, for the publication by the plaintiff of a work to be written by the defendant " in the nature of autobiography, or reminiscences of his life, and the acts and doings of other public men, so far as they may seem to him to elucidate the history of the country or public affairs"; and containing the following clause: " The party of the first part agrees to accept full responsibility of all matter contained in said work, and to defend at his own cost any suits which may be brought against the party of the second part for publishing any statements contained in said work, and to pay all costs and damages arising from said suits."

Trial in this court, before *Holmes*, J., who reported the case for the consideration of the full court, as follows:

" The said contract was duly made between the plaintiff and defendant, and was made without illegal intent, unless and except so far as the words used import one as matter of law. The first question which I report for the consideration of the full court is whether the contract is legal on its face.

" The plaintiff takes its name from one C. F. Jewett, who, at the date of the contract, owned half its stock, and was its president and manager. The defendant was induced to execute the contract by Jewett, and Jewett was the only man he knew, or with whom he had any dealings.

" In May, 1890, Jewett fled from justice, having forged, over-issued, and pledged one and one half times the stock of the plaintiff company, and these facts became known to the public. The defendant, when informed of them, declined to go on with the contract. At that time he felt, and expressed to the agents of the plaintiff, a doubt as to the plaintiff's continued solvency, and this doubt was reasonable. It was very doubtful whether the plaintiff was not liable for the fraudulent over-issue of stock until the decision of this court in *Hill* v. *C. F. Jewett Publishing Co.* 154 Mass. 172, which may be referred to. On the other hand, the defendant was informed and had reason to believe that the other members of the company, being members of the bookselling firm of Estes and Lauriat, as a voluntary act, could and would furnish the company sufficient money to enable it to publish the defendant's book as agreed, and were willing to have their names, instead of that of the C. F. Jewett Publishing Company, upon the book; but, as it turned out, the C. F. Jewett Publishing Company would have been able to publish the book, the disgrace attaching to the name C. F. Jewett would not have affected sales appreciably outside of New England, and I am not satisfied that it would have affected them very greatly anywhere. The second question is whether the facts above stated disclose a legal justification for the defendant's refusal to complete his contract.

" If the contract was valid, and the defendant was not justified in breaking it, judgment is to be entered for the plaintiff for $2,500, with interest from June 9, 1890."

The case was argued at the bar in March, 1893, and afterwards was submitted on the briefs to all the judges.

*E. C. Bumpus*, (*S. J. Elder* with him,) for the plaintiff.

*J. Lowell & E. M. Johnson*, for the defendant.

MORTON, J.   The first question is whether the contract is, as the defendant contends, illegal on its face.   The words relied on to show that it is are as follows : " The party of the first part agrees to accept full responsibility of all matter contained in said work, and to defend at his own cost any suits which may be brought against the party of the second part for publishing any statements contained in said work, and to pay all costs and damages arising from said suits."   The presiding justice found that the contract " was made without illegal intent, unless and except so far as the words used import one as matter of law."   We think that the contract does not import one as matter of law.   The parties were contracting respecting a book which was not in existence, but was to be written.   There was nothing in the character of the proposed work which naturally or necessarily involved the publication of scandalous or libellous matter, as was the case, for instance, in *Shackell* v. *Rosier*, 2 Bing. N. C. 634, referred to by the defendant.   At the same time it was not impossible that in spite of due care and good faith on the part of the author and publisher the proposed book might contain matter which others perhaps would deem libellous.   In such a case it would be no more unlawful for the parties to provide that the author should save the publisher harmless from all costs and damages to which he might be subjected by reason of the publication of the book, than it would be for a patentee to agree with his licensee that he would protect him against all costs and damages to which he might be subjected in consequence of using the patent to which the license applied.   The case stands on grounds entirely different from those on which it would stand if it appeared that the parties intended to publish or contemplated the publication of libellous matter.   There is nothing in the agreement fairly to show that such was their purpose.   The most that can be said is, that though there was no intention to write or publish, nor any contemplation of writing or publishing, libellous matter on the part of the author or publisher, it might turn out after

the book was published that it did contain libellous matter. But that is very far from saying that the parties had in view an illegal purpose in publishing the book. We see nothing unlawful in a contract which provides, without anything more, that the author shall indemnify the publisher for costs and damages to which he may be subjected by reason of the publication of a book to be written by the author.

Moreover, it was possible in this case that the book might not contain libellous matter, although libel suits against the publisher might grow out of it. It would be hard to say in such event that the publisher who might have published the book without any libellous purpose, and in the full belief that it contained nothing libellous, could not recover of the author under this clause in the contract the costs and damages to which he had been put by such suits. In order, we think, to render the contract unlawful, it should appear that there was an intention on the part of the author and publisher to write and publish libellous matter, or that the author proposed, with the knowledge and acquiescence of the publisher, to write libellous matter, or that the contract on its face provided for or promoted an illegal act. We do not think the clause in question is fairly susceptible of either construction. *Fletcher* v. *Harcot*, Hutton, 55. *Battersey's case*, Winch, 48. *Betts* v. *Gibbins*, 2 Ad. & El. 57. *Adamson* v. *Jarvis*, 4 Bing. 66. *Waugh* v. *Morris*, L. R. 8 Q. B. 202. *Pearce* v. *Brooks*, L. R. 1 Ex. 213. *Cannan* v. *Bryce*, 3 B. & Ald. 179. *Graves* v. *Johnson*, 156 Mass. 211.

The defendant contends, in the next place, that he was justified in his refusal to go on with the contract, because of his doubts as to the solvency of the plaintiff corporation, and because of the disgrace attaching to its name in consequence of the conduct of Jewett.

The first ground thus taken would seem to be disposed of by the recent cases of *Hobbs* v. *Columbia Falls Brick Co.* 157 Mass. 109, and need not therefore be further considered.

Regarding the second ground, it is to be observed that the contract was not made with Jewett personally, but with the corporation which bore his name. Moreover, Jewett has fled, and it fairly may be presumed that his place as president and

manager has been filled by the election of another person, so that the defendant cannot and will not be obliged to come into further association with him. It is well known that corporations are frequently organized which bear as part of their corporate name the name of some individual. The contention of the defendant would require us to hold that in all such cases a party making a contract with such a corporation would be justified in refusing to go on with it if the person whose name the corporation bore committed an act rendering him liable to punishment as a criminal, or bringing him into disgrace and rendering further association with him unprofitable and injurious to the other party to the contract. But a corporation does not in such a case impliedly guarantee, as an element of the contract entered into with it, that the person whose name it bears shall continue to be a reputable member of society. The corporation is distinct from the person whose name it bears. Its interests and those of its stockholders in contracts made by it with other parties are not to be affected by the disgraceful or criminal conduct of the person whose name it bears, and for which it is in no way responsible. A majority of the court think the entry should be judgment for plaintiff for $2,500, and interest from June 9, 1890, and it is                    *So ordered.*

LATHROP, J. I am unable to concur in the opinion of the majority of the court that the contract sought to be enforced is a valid contract. The contract provides for the publication of a work to contain the author's autobiography, " or reminiscences of his life, and the acts and doings of other public men, so far as they may seem to him to elucidate the history of the country or public affairs." It is in reference to a work of this character that the defendant agrees to do three things: first, " to accept full responsibility of all matters contained in said work"; secondly, " to defend at his own cost any suits which may be brought against the party of the second part for publishing any statements contained in said work"; and thirdly, " to pay all costs and damages arising from said suits." The obligation of the defendant is not limited to paying legal expenses, but includes costs and damages recovered against the publisher " for publishing any statements contained in said work." While it is

found that the parties acted without illegal intent, yet if the legal effect of the language used is to make the contract against the policy of the law, this court ought not to enforce it. It seems to me to be impossible to say that the language used applies only to groundless suits, and that it should so be construed. What the parties contemplated, and what they intended to provide for, was that actions might be brought against the publisher for libellous matter contained in the work; that these actions might be successfully maintained against the publisher, who would then be compelled to pay damages and costs. In this event the writer agreed to indemnify the publisher. Could such an agreement have been enforced? In my opinion it could not, and this view is sustained by the authorities. *Shackell* v. *Rosier*, 2 Bing. N. C. 634. *Colburn* v. *Patmore*, 1 C., M. & R. 73. *Gale* v. *Leckie*, 2 Stark. 107. *Clay* v. *Yates*, 1 H. & N. 73. *Arnold* v. *Clifford*, 2 Sumn. 238. Odgers, Libel and Slander, (2d ed.) 8. See also *Bradlaugh* v. *Newdegate*, 11 Q. B. D. 1, 12; *Babcock* v. *Terry*, 97 Mass. 482. It follows that the whole contract was tainted with illegality, and neither party was bound to go on with it. *Robinson* v. *Green*, 3 Met. 159, 161. *Perkins* v. *Cummings*, 2 Gray, 258. *Woodruff* v. *Wentworth*, 133 Mass. 309. *Bishop* v. *Palmer*, 146 Mass. 469. *Lound* v. *Grimwade*, 39 Ch. D. 605, 613.