Argued March 1, affirmed June 12, costs taxed July 17, 1928.

MARTHA F. TRAVER *v.* GEORGE F. NAYLOR
ET AL.

(268 Pac. 75.)

For appellants there was a brief over the name of *Mr. Wm. C. Ralston,* with oral arguments by *Mr. Lotus L. Langley, Mr. Chester A. Sheppard* and *Mr. Loyal M. Graham.*

For respondent there was a brief and oral argument by *Mr. E. B. Tongue.*

RAND, C. J.—This suit was brought by Martha F. Traver against the heirs and personal representatives of Edward L. Naylor, deceased, seeking to obtain the specific performance of an alleged verbal contract entered into between plaintiff and decedent whereby, in consideration of personal services which plaintiff contracted to perform for him, decedent undertook to make a will and to devise his entire estate to her. The complaint sets forth the contract and the terms thereof and alleges that plaintiff completely performed the contract upon her part and that decedent failed to make a will and died intestate, and prays that the heirs and personal representatives of decedent be decreed to hold the property of the estate in trust for plaintiff and be required to transfer and convey the same to her. The answer admits that plaintiff performed services for decedent but denies that any contract of the kind or character referred to in the complaint was ever entered into between plaintiff and decedent or that any services were performed under any such contract. It also alleges that plaintiff has been fully compensated for the services performed and it is now claimed that if the alleged contract was made as contended for by plaintiff it was based upon an illegal consideration, and, therefore, is unenforceable. The evidence was taken and the suit was tried and decided by Judge BAGLEY, and a decree was entered in the lower court awarding plaintiff the relief prayed for in the complaint. From that decree defendants have appealed.

It appears from the evidence that, while decedent was at his home near Forest Grove, in the evening

of December 9, 1910, about 7 or 8 o'clock, he was shot and wounded by an unknown assailant, the bullet penetrating the intestines. He was immediately taken to the St. Vincent's Hospital at Portland where he was operated upon and the bullet and a part of his intestine removed. It was while there, and about two weeks later, that it is claimed the contract in question was entered into. For a long time thereafter his life was despaired of and his condition was such that he was compelled to remain at the hospital until June 20, 1911. He was then taken to plaintiff's home at Forest Grove where he remained until his death, which did not occur until March 15, 1920. Although living more than nine years after being shot, he never fully recovered and died from the effects of the wound. The evidence shows that a fistula developed which never healed and resulted in a running sore having a very offensive discharge and requiring constant attention up to the very hour of his death. Notwithstanding this he was able to be up and around a considerable part of the time and to engage in light work, but he was much debilitated and never entirely free from pain and his wound needed constant dressing.

At the time of the shooting plaintiff and decedent were engaged to be married and were intending to marry between the following Christmas and New Year's. She was a teacher in the public schools and held a life diploma entitling her to teach in the public schools of the state. She had also entrusted decedent with a part of her earnings for safekeepng and investment. Decedent was a graduate of Pacific University and was engaged in farming. He owned several tracts of land and some livestock. At the time of his death his property was appraised at some-

thing over $16,000. He was somewhat eccentric in character and had but few, if any, intimate friends. He was on bad terms with all of his relatives and entertained as against them feelings of bitter hostility and they seemed to have had reciprocal feelings toward him. Whether he was justified in so doing or not, he often remarked after being shot that his relatives wanted him to die so that they could inherit his property, which he said he would not permit them to do. At the time of the shooting plaintiff's home was close to the house where decedent was living. She heard the shots and was the first person to reach his side. She made the arrangements for taking him to the hospital and went with him and remained constantly with him during all of the time that he was there and assisted in caring for and nursing him while there and, at his request, was present with him in the operating room. After he had been in the hospital about two weeks he was feeling somewhat better and plaintiff, whose term of teaching had not expired, started to write a letter to the clerk of the school board, informing him that she would return to Forest Grove and complete the term. Seeing her writing, decedent said, "What are you doing?" and, upon being informed, called her to the bedside. Plaintiff's version of what then occurred is as follows:

"And I went to his bedside, and he reached for my hand and kissed my hand. He says, 'You have never faltered, have you?' and he cried. I didn't say anything—I didn't know what was coming. * * He says, 'I can't live,' he says, 'I don't want you to go back,' and he didn't say anything for a little bit, and he looked at me and he says, 'Girl, I can never marry you; I am not fit; I have only this poor broken body.' I said, 'Don't say that, Ed.' He said, 'No,' he says, 'No, I would be only a burden to you; I am not fit.'

I didn't know what to say. I didn't say anything.
He says, 'You are not going back,' he says, 'you will
make it your business to take care of me, but you
will not teach school any more.' * * I says, 'I will
finish my school; I will run in every week-end; I
will come and stay with you, and you have a good
nurse.' I says, 'I think that would be better.' * *
He says, 'You are the only one who cares for me;
you are all I have left now.' It seemed as though
I couldn't decide what to do. I wanted to do what
was right; I didn't want to do anything that would
harm him, to make him worse. * * 'Well,' he says,
'I have plenty for both of us.' He says, 'There is
plenty for both of us; you take care of me and let
the school go; I will pay the bills, you won't need to
worry about that.' He says, 'I will get you anything
you want, girl.' He says: 'When I go and can't
live, when I go,' he says, 'I will give everything I
have to you.' He says, 'Just as soon as it is so I
can I will make a will, I will make my will leaving
you everything'; he said, 'Don't leave me.' * * He
kept hold of my hand and he says, 'Don't leave me;
you are all I have got left,' and I just leaned over and
kissed him on the forehead and says, 'I will stay with
you, dear.'

"Q. Now, before that time, and before he was shot
had you talked over your future plans after you were
married? A. Yes, we talked and talked. * *

"Q. Now, did you talk that over any more while
he was at the hospital—anything ever said about it
afterward? A. Only that he would call me to the bed-
side—I think he must have, it seemed to me, every
day or every other day I would have to drop what
I was doing sometimes—I always looked, was watch-
ing, and thought maybe it was the end every time he
would call me, I thought sure it was, but all he would
say, he would get hold of my hand, he says, 'I am
afraid you will get tired of me; I am afraid you will
get tired of your bargain,' he says, 'you are going
to take the worst of this,' he said, 'don't quit me'—

make those remarks. Other times he would say, 'Don't leave me'; that is all he would say.

"Q. When he told you that what would you say to him? A. I told him not to worry.

"Q. Did you ever quit him? A. I never did. * *

"Q. Well, what was it? Confine yourself now to what was said about what you were to do and what he was to do. .A. I was to take care of him as long as he lived and help him. When he was gone he was going to give me all his property.

"Q. He said he was going to give you all his property? A. He was going to make his will and leave the property to me.

"Q. Is. that all he said? A. He said I was all he had; there was no one else to care for him.

"Q. Did he say anything else? A. He begged me not to leave him.

"Q. What did he say? A. I told him there would be talk.

"Q. You told him there would be talk. Is that all you said? A. I told him that I had no other way to live, excepting to teach school.

"Q. Well, what did he say? A. He said he had plenty for both of us; that I didn't need to teach any more, that there was plenty for both of us while he lived and when he was gone he said if he had to go it was all mine.

"Q. If he had to go it was all yours. A. Yes.

"Q. What did you say? A. He begged me not to leave him; he said I was the only one that cared.

"Q. What did you say? A. I told him I would take care of him.

"Q. Did he ever give you any money from the time he was shot until he died? A. Only to pay some bills or to return some of my own school money; some of my school money—he didn't give it to me."

Plaintiff's testimony in respect to the making of the contract and the terms thereof was corroborated by the following witnesses:

Matthew Patton, who was an old friend and business associate of decedent, testified that while decedent was at the hospital he visited him and that decedent told him that plaintiff had agreed to take care of him as long as he lived and that decedent had agreed that she should have all his property upon his death.

Thomas Phillips testified that he was at the hospital and decedent told him in plaintiff's presence that "she is going to take care of me as long as I live and when I am dead everything that I have will be hers," and "I am going to draw up my will right away as soon as I get strong enough."

W. A. Goodin testified that after decedent had returned to Forest Grove he had a conversation with him in which decedent said "he had been shot and was in very bad shape and he had made arrangements with Miss Traver to take care of him during his lifetime, and that he was to leave her his property. He thought it was a legitimate proposition, that he had a right to make that arrangement to have somebody to take care of him." He also testified that decedent said that "he felt himself slipping; he didn't know how long he was going to live" and that "she has been taking care of me and I am going to leave her my property."

J. F. Haney testified that decedent told him that "she was to take care of him as long as he lived and she was to have his property at his death, everything." That he asked decedent, "Ain't you going to give some to the folks?" and that decedent said, "To hell with the people; nobody has ever done anything for me but her; she has taken care of me and she is entitled to everything I have," and that decedent had made "the arrangement with her that

she was going to take care of him as long as he lived and she was to have everything at his death."

E. A. Rhoten testified that decedent told him that plaintiff had taken care of decedent and was to get his property when he died.

Mrs. Clara A. Dennis testified that decedent said: "If ever I recover I will marry her but I am not qualified to marry her. As far as the finances, she is provided for; she will get all if I die."

F. P. Edgington testified that "he (decedent) said he had made arrangements so that she (plaintiff) would get what he had left."

Fritz Schlie testified that decedent said: "Everything I got is supposed to go to her. My relation won't get none of it of what I got left after I am through with it."

William Adler testified that decedent told him that "he had willed his property to Miss Traver."

■ There are many other facts and circumstances in addition to those referred to in the testimony to which we have called attention which, in connection with such testimony, clearly convinces us, as it did the trial court, that a contract was entered into between plaintiff and decedent by the terms of which plaintiff was to nurse and care for decedent as long as he might live and decedent, in consideration of such services, was to devise his property to plaintiff. That plaintiff fully performed the contract upon her part is clearly established by the evidence. She remained with him during all of the time he was in the hospital and assisted in nursing and caring for him. She abandoned her vocation as a teacher, and when he was removed from the hospital took him to her home, where for a long time he was confined to his bed, during which time she took the sole care

of him, washed and bathed him, dressed his wound, cooked for him, did his laundry work, fed and tended to the stock upon his farm, and, after his partial recovery, kept him at her home, cooked and washed for him, dressed his wound, worked upon his farm and assisted him in every way and, during such times as he became unable to wait upon himself, the evidence shows that she ministered to him as a mother would to her child and during his last illness she ministered to him until he was dead. The evidence further shows that, in order to bind her more strongly to her bargain, decedent tore up plaintiff's life certificate, accepted her care and nursing and in every conversation he had with others, so far as the evidence shows, he stated unequivocally that plaintiff had contracted with him to perform these services for which he was to devise to her his property upon his death. This testimony is clear, satisfactory and convincing and leaves no doubt in the mind of the court as to the existence of the contract and as to the terms thereof. The contract itself is definite and certain in all of its terms and it has been fully complied with by plaintiff. In respect to the contract itself and to the performance of it by plaintiff, the learned trial judge, in a memorandum opinion filed in the lower court, among other things said:

" * * His relations with the plaintiff previously had been such as to inspire mutual confidence, trust, and respect; he had never been married and his associations with his nearest relatives had been in some instances unpleasant, in others, strained and embittered. It was manifest to him in his wounded condition, that should he survive the serious abdominal injury from which he was suffering, he would be physically incapacitated for a long period of time, and perhaps for the remainder of his life. He believed,

whether true or not, that he could not turn to his blood relatives and secure that character of care, attention, and consolation which was so vital to his welfare. Urged by the greatest concern a man in his situation and condition could have—his own wellbeing—he turned, in his hour of need, to the woman in whom he had confidence, and requested her to give up her vocation and remain with and care for him during his life, assuring her that he would make compensation for such services by a devise of all of his property to her. Plaintiff's testimony is satisfying upon this subject. It is, however, corroborated by many circumstances and sustained by declarations of Naylor to disinterested parties made at various times and under conditions that impel belief. The proofs as to the allegations of the existence of the contract are not only clear and convincing but carry the mental convictions beyond a reasonable doubt. If more were needed there are presumptions arising from the performance of the services that would aid in arriving at the conclusion that such contract was made as declared, and of the character and terms alleged in the complaint. There seems to be no escape from this conclusion. It was a rational contract, mutual in its terms. It answered all of the needs of Naylor whose condition required the character of services contracted for. It burdened the plaintiff with an obligation requiring a sacrifice of her personal aspirations and her usual vocation in life. The property was Naylor's. He had the legal right to contract to dispose of it by will as compensation for those material things he most needed.

"Did plaintiff discharge the duties and obligations of her contract? Little need be said upon this subject. The testimony strikes a responsive chord in the human breast and appeals to the conscience and understanding. Man has not the great unselfish power of renunciation and self-abnegation, but we do find this great gift in the gentle breast of woman. With the great magnanimity of womankind, plaintiff waived all consideration of self and thought only of

the welfare of Naylor, and the fidelity of plaintiff to the covenant of service she undertook is a lesson from which many might profit. The contract was made in December, 1910. She remained with him constantly from that time until his death in March, 1920. And it may be added that his death resulted from the wound he received in 1910. Naylor was always suffering pain and was querulous and exacting in his demands, eccentric, and with the obstinacy usual to such. She performed every exacting duty required by the contract, and more. She sacrificed her friendships and her social and moral status in so doing. It should be sufficient to say, without going into details, that she never forsook a duty. She met every obligation, and from day to day covering a period of ten years she was weighed in the balance and found not wanting. There can be no scoffers or doubting-Thomases on the score of performance. Naylor had the benefit of her society and companionship, her trust and confidence, her unremitting care and attention, her devotion to his best interests and welfare for nearly ten years of his life, the prolongation of which was due to that devotion.''

■ It is settled law in this state that a person may enter into a valid contract to devise his property to a particular person in consideration of personal services to be performed for him, and that a court of equity will enforce a parol contract to devise land if the contract is founded upon a valuable consideration and is clear, definite and without doubt. Such a contract, however, being one that performance of the devise is not due until the time of the death of the promisor, equity grants what is equivalent to giving specific performance by fastening a trust upon the land in the heir or devisee and enforcing conveyance by the one holding the legal title in favor of the purchaser under the contract to devise: *Rose* v. *Oliver*, 32 Or. 447 (52 Pac. 176); *Richardson* v.

*Orth,* 40 Or. 252 (66 Pac. 925); *Kelley* v. *Devin,* 65 Or. 211 (132 Pac. 535); *Woods* v. *Dunn,* 81 Or. 457 (159 Pac. 1158); *Mathews* v. *Tobias,* 101 Or. 605 (201 Pac. 199); *Bagley* v. *Bagley,* 110 Or. 368 (222 Pac. 722); *Popejoy* v. *Boynton,* 112 Or. 646 (229 Pac. 370); Pomeroy's Equity Jurisprudence, § 745.

One of the remaining contentions is that the contract in question is unenforceable because a part of the consideration for the promise contemplated the future illicit cohabitation between the parties. The evidence shows that plaintiff, upon decedent's leaving the hospital, took him to her home at Forest Grove where they lived together alone in her house until his death. The evidence further shows that this caused considerable talk among the neighbors and resulted in the return of two indictments by the grand jury of Washington County, charging decedent with lewd and lascivious cohabitation with plaintiff and that he was convicted upon one at least of said indictments.

Wharton in his work on the Law of Contracts, Volume 1, Section 373, states the law thus:

"An agreement is void when the consideration is future illicit cohabitation, no matter what other considerations may unite or how skillfully the illegal object might be clothed."

In discussing what constitutes a valuable consideration of a contract, Chancellor Kent, in his Commentaries, Volume 2, Fourteenth Edition, star paging 466, says:

" * * The consideration must not only be valuable; but it must be a lawful consideration, and not repugnant to law, or sound policy, or good morals. *Ex turpi contractu actio non oritur;* and no person, even

so far back as the feudal ages, was permitted by law to stipulate for iniquity.''

In *Kimbrough* v. *Lane,* 11 Bush (Ky.), 556, it is said:

''And it is equally well settled that if any part, however small, of the entire consideration of a contract, be vicious, the whole contract is void.''

To the same effect see *McLane's Admr.* v. *Dixon* (Ky.), 99 S. W. 601.

■■■ Where a contract is founded on two considerations, one of which is merely void but not vicious and the other good, the contract is binding to the extent of the good consideration: *Steinfeld* v. *Levy,* 16 Abb. Pr. (N. S.) 26. Future cohabitation is a vicious consideration, and if it constituted any part of the consideration for the promise the whole contract is void.

'' * * But, as to contracts valid on their face, illegality is never presumed, and the party setting it up has the burden of proof. *Forsyth Manuf. Co.* v. *Castlen,* 112 Ga. 199 (37 S. E. 485, 81 Am. St. Rep. 28); *Burdine* v. *Burdine,* 98 Va. 515 (36 S. E. 992, 81 Am. St. Rep. 741); *Jewett Pub. Co.* v. *Butler,* 159 Mass. 517 (34 N. E. 1087). So a contract valid on its face is not impaired by the performance of one of several illegal acts in executing it. *Dunham* v. *Hastings Pavement Co.,* 57 App. Div. 426, 68 N. Y. Supp. 221.'' 1 Parsons on Contracts (9 ed.), bottom paging 495, note.

The contention that plaintiff and decedent, at the time of entering into this contract, either contemplated or intended to cohabit as man and wife or that they ever did subsequently so cohabit together is not supported by the testimony of a single witness and is discredited by every fact and circumstance proven

in the case. Whenever the matter was referred to decedent always indignantly denied, and plaintiff explicitly denies, that any such improper relations ever existed between them. Decedent's physical condition and his repeated declarations to plaintiff and others that he was physically incapable of assuming the marriage relation, as well as the presumption, in the absence of proof to the contrary, that their relations were regular and honorable, are more than sufficient to silence the slanderous tongues that were raised against them. If ever there was a case where the admonition ''Judge not that ye be not judged'' ought to have been applied it seems to us that this was the case. The leading trial judge disposed of this contention by a finding in the following words:

''The contract is not void as against public policy nor was it contrary to good morals, or condemned by public policy. At the time the contract was entered into Naylor was a man to whom life was a burden, whose miseries seemed to multiply with the passing of time, who, groping in the dark at night and living in the gloom by day, was given to ceaseless yearnings and terrifying fears; he was without an ardent friend or relative, alone except for the comfort, care, companionship, society, and solace derived from the presence of the plaintiff. Doubts tenanted the minds of Naylor and the plaintiff as to the ultimate result of the wounds from which he was suffering. The moribund have a far-reaching glance of the realms of time. Naylor, grievously wounded, suffering physical agony, in despair of life, a time when the mind reviews in a revealing panoramic flash, the good and evil of life; standing as it were in the very presence of the King of Terrors, slowly approaching the threshold of God's judgment seat, surroundings and circumstances that would rebuke and subdue the fiercest lust that ever burned in human breast, and can it be said, is it conceivable that he at that time

contemplated entering into a contract requiring illicit cohabitation as a part of the consideration thereof? No one can read the record in this case without realizing the condition of Naylor, his forebodings, his intense yearning to maintain a grasp upon the threads of life. Manifestly, Naylor knew and realized the character of services, society, and companionship that was necessary and of grave importance to him in the condition he was in. It was in these surroundings and under such actual necessities that the contract had its inception. Social impunity was not contemplated. The agreement portrayed in the pleadings does not embrace any such requirement and the contract, therefore, is not condemned by the law."

■ The judicial record of decedent's conviction and the evidence in the criminal case were offered and received in evidence here. After a careful reading of that evidence we find, notwithstanding the verdict, no evidence to sustain the charge and, upon appeal, the judgment in the criminal case was reversed. See *State* v. *Naylor*, 68 Or. 139 (136 Pac. 889). But, regardless of whether the judgment had been reversed or not, this record and this evidence was not competent, pertinent or admissible for any purpose in this case. It is only referred to to show how signally defendants have failed to sustain the burden of proof upon this issue.

" * * it is obvious that, as a general rule, a verdict and judgment in a criminal case, though admissible to establish the fact of the mere rendition of the judgment, cannot be given in evidence in a civil action, to establish the fact on which it was rendered. * * there is a material difference between proving the existence of the record and its tenor, and using the record as the medium of proof of the matters of fact recited in it. * * Thus, if one indicted for an assault and battery has been acquitted,

and sues the prosecutor for malicious prosecution, the record of acquittal is evidence for the plaintiff, to establish that fact, notwithstanding the parties are not the same. But if he were convicted of the offense, and then is sued in trespass for the assault, the record in the former case would not be evidence to establish the fact of the assault; for, as to the matters involved in the issue, it is *res inter alios acta.*"

Greenleaf on Evidence (16 ed.), Sections 537, 538. See, also, Jones on Evidence, Section 589.

■ But even if there had been proof that plaintiff's and decedent's relations had become improper after the contract had been entered into and while it was being performed by plaintiff, the existence of such relations would not have rendered the contract invalid because such relations were no part of the consideration of the contract. On its face, the contract was valid and could be completely performed without the doing of a single illegal act, and hence its validity would not be impaired by wrongful acts subsequently done which were not within the contemplation of the parties at the time of its making.

■ It appears that plaintiff was a witness for the defendant in *State* v. *Naylor, supra,* and that she testified that Naylor was paying her $20 a month for her services. This is a direct contradiction of her present testimony and she now admits that her former testimony was knowingly and intentionally false. She assigns as the reason for giving of such testimony Naylor's statement to her that unless she would so testify he would commit suicide and that, fearing he would do so, she promised to give the false testimony. She relates in harrowing detail how Naylor, in her presence, being despondent over having been indicted, drew a knife and threatened

to stab himself unless she would consent to testify as he requested and how, through fear upon her part, she promised him and complied with his request by giving the false testimony. Defendants invoke the maxim of *falsus in uno, falsus in omnibus* and contend that since plaintiff perjured herself in the criminal action she is so discredited that no reliance whatever can be placed upon her present testimony. The fact that plaintiff testified falsely in the criminal case is entitled to the most serious consideration and if her testimony in the present case was not so strongly corroborated in every important particular by so many disinterested witnesses, whose testimony cannot be true unless her present testimony is true, or if the question was a close one, we might be authorized to disregard her testimony.

As said by Mr. Justice LORD in *Wimer* v. *Smith,* 22 Or. 469 (30 Pac. 416):

"Where the facts depend entirely upon the testimony of an uncorroborated witness, whose credibility is plainly impeached, a court or jury would be₀ authorized to disregard his testimony; but even where it is shown that a witness has a bad reputation for truth, his evidence is not necessarily destroyed, but is to be considered under all the circumstances described in the evidence, and given such weight as the trial tribunal believed it entitled to. 'Such witnesses,' said BEASLEY, C. J., 'are to be relied on in any judicial proceeding, only so far as their testimony is intrinsically probable, or is corroborated by circumstances.' (*Adams* v. *Adams,* 17 N. J. Eq. 334.) So that the court is not bound to disregard the evidence of an impeached witness, but it should be compared with the other evidence and facts proved in the case, and given such weight as it is entitled to under the circumstances."

The testimony of plaintiff in the present suit is so "intrinsically probable" and is so "corroborated by circumstances" that, as did the trial court, we believe her present testimony to be true.

■ But one other point need be noticed. The defendants, or some of them, instituted in the County Court for Washington County a proceeding, under Sections 1309—1 to 1309—6, Or. L., to obtain in that court a determination of the identity of the heirs and distributees of the estate of decedent. Plaintiff was not made a party to that proceeding and did not appear. It is now claimed that her right to enforce the contract is barred by the decision of that court, in its ascertainment and determination of the heirs and distributees of decedent's estate. That decision is in no way binding upon this plaintiff. That court had no jurisdiction to enforce specific performance of plaintiff's contract and could have given her no relief if she had been a party to it. She was not an heir of decedent nor a distributee of his estate and but for the contract would have had no interest in the real or personal property of the estate. The words "heirs" and "distributees," as used in the statute, have a well-defined legal meaning and the statute was not intended to embrace persons not coming within the meaning of the terms when given their legal significance. So far as plaintiff's right to equitable relief in this suit, those proceedings were a mere nullity.

We concur with the lower court in holding that a contract was entered into between plaintiff and decedent as alleged in the complaint, that the contract was definite and certain in all of its terms and was binding upon both parties, that it was not tainted with fraud nor founded upon an illegal considera-

tion, that its existence and terms have been established by clear, convincing and satisfactory testimony, that it has been fully performed by plaintiff, and that plaintiff is entitled to the equitable relief prayed for in the complaint and, therefore, we affirm the decree. AFFIRMED. COSTS TAXED.

COSHOW, MCBRIDE and ROSSMAN, JJ., concur.