CHARLES F. GALL, APPELLANT, *v.* AMELIA GALL, INDIVIDUALLY AND AS ADMINISTRATRIX OF JOSEPH GALL, DECEASED, AND OTHERS, RESPONDENTS.

*Specific performance — proof of an agreement to will one's estate to another — effect of the subsequent marriage and issue of the promisor.*

The complaint in an action for specific performance alleged that Charles Funkenstein entered into an agreement with Joseph Gall, his uncle, whereby he agreed to give up a valuable business in San Francisco, reside with Joseph Gall in New York city, enter his business and adopt his name; that, in consideration thereof, Joseph Gall, who was childless, agreed to leave to Charles Funkenstein by will the remainder of his estate after deducting certain proposed legacies; that

Charles Funkenstein carried out the agreement upon his part; that Joseph Gall made a will in his favor, but that after the making of the agreement and of the will Joseph Gall married again and had issue.

The complaint demanded certain specific relief.

*Held,* that the action could not be maintained.

That a contract of such a nature, which the court would enforce, must be certain and definite in all its parts, mutual and founded upon an adequate consideration, proved by the clearest evidence, not unjust to innocent third parties nor contrary to public policy.

That any contract interfering with the right to dispose of property by will was looked upon with suspicion.

That there was no mutuality in the obligation of the contract in question, since the plaintiff might have left Joseph Gall at any time.

That the second marriage and issue of Joseph Gall were fatal to the enforcement of the agreement, since an agreement which contemplated taking from a father his entire estate, to the exclusion of his future wife and children, would be against public policy.

That whatever agreement was made must necessarily be subject to such possibilities, and was limited by implication accordingly.

APPEAL by the plaintiff Charles F. Gall from a judgment of the Supreme Court, entered in the office of the clerk of the city and county of New York on the 14th day of May, 1891, dismissing the complaint upon the merits after a trial at the New York Special Term by the court.

The action was brought to enforce the specific performance of an agreement under which the plaintiff was to give up business and reside with defendant's intestate, who, in consideration thereof, was to make a will in plaintiff's favor. Joseph Gall (the intestate) was, at the time the agreement was made, and when his will was made on April 3, 1883, a widower and childless.

*Abram Kling,* for the appellant.

*A. Simis, Jr.,* for Amelia Gall, respondent.

*B. F. Blair,* for infants, defendants.

BARRETT, J.:

It is undoubtedly the settled law of this State that " where a certain and definite contract is clearly established, even though it involves an agreement to leave property by will, and it has been performed on the part of the promisee, equity in a case free from all

objections on account of the adequacy of the consideration or other circumstances rendering the claim inequitable, will compel a specific performance." (*Shakespeare* v. *Markham*, 10 Hun, 322; affirmed, 72 N. Y., 406; *Parsell* v. *Stryker*, 41 id., 480.) Such a contract, however, especially when it is attempted to be established by parol, is regarded with suspicion and not sustained, except upon the strongest evidence that it was founded upon a valuable consideration and deliberately entered into by the decedent. (Waterman on Specific Performance, § 41.)

The cases in which performance of such contracts have been enforced in this State were principally cases where specific property was agreed to be devised or bequeathed upon an adequate consideration. Such was the case of *Parsell* v. *Stryker* (above cited), where, indeed, the contract sought to be enforced was in writing and entirely specific.

The lands which were the subject of the agreement under consideration in *Mutual Life Insurance Company* v. *Holloday* (13 Abb. N. C., 16), consisted of a definite tract called "Ophir Farm." This was also the case in *Sherman* v. *Scott* (opinion of RUMSEY, J., 13 Abb. N. C., 20, note; affirmed, 27 Hun, 149). In *Matthews* v. *Matthews* (62 Hun, 111), the agreement was a *certain* specific *part* of the decedent's premises and chattels.

We have, however, found no case in this State where an agreement to leave the whole of one's estate, real and personal, to a particular person has been enforced. On the contrary, there are cases where specific performance of such a contract has been refused. It was refused in *Lusk* v. *Sherman*, referred to in the same case (25 Barb., 435), when, after the dismissal of the bill, an action was brought for money compensation. The refusal was based upon the uncertainty which necessarily existed with regard to the subject-matter. This was recognized in *Shakespeare* v. *Markham* (*supra*), where TALCOTT, J., observed that "there was no restraint by the supposed contract upon the testator's power to dispose of the same or any part thereof during his life, and the amount which he should have at his death was, therefore, wholly uncertain. The contract, therefore, by reason of its uncertainty, was one which a court of equity would not be under the necessity of compelling performance of."

The case of *Lusk* v. *Sherman* was approved of in the case last cited, both at General Term and in the Court of Appeals. TALCOTT, J., at General Term, said it was quite similar to the case then under consideration, as the agreement " was that the plaintiff was to live with and take care of the testatrix as long as the latter lived, and at her death was to have all the property which the testatrix should have at her death."

It is vitally important that the statute of wills should be maintained in its integrity; and the courts should not, by lessening or weakening the well-defined prerequisites to specific performance, furnish a loop-hole for the evasion of its provisions. So important are these provisions with respect to testamentary disposition, that it has been doubted whether, in any case, especially when the contract is sought to be established by parol testimony, so patent a means for their evasion as bills for specific performance should have been allowed. (*Shakespeare* v. *Markham, supra.*) It is certain, however, that in this class of cases the ordinary rules which govern in actions to compel the specific performance of contracts, and which furnish reasonable safeguards against fraud, should be rigidly applied. These rules require that the contract be certain and definite in all its parts; that it be mutual and founded upon an adequate consideration; and that it be established by the clearest and most convincing evidence. Even then, when the contract limits a man's right to dispose of his property by will, it is regarded with suspicion and enforced only when it is apparent that the hand of equity is required to prevent a fraud upon the promisee. There is another rule which should be strictly adhered to in this class of cases, and that is, that the remedy is a matter of judicial discretion, and that relief should be withheld where a decree for specific performance would work injustice to innocent third persons, or where it would be contrary to public policy. (*Armstrong* v. *Armstrong,* 1 N. Y. St. Rep., 531, and cases there cited.)

Applying these principles to the case under consideration, we think the judgment of the Special Term dismissing the complaint was correct. In the first place the contract was not established with reasonable certainty. It was not made with parents for the benefit of an infant, but directly with an adult. The proof rests entirely upon the declarations of the decedent. Some of these declarations

were, it is true, made in the presence of the plaintiff, but they were not in the nature of a present bargain.

Many of these declarations were merely as to the decedent's intention, while others were as to what had been done. He told some witnesses that he had made a will in the plaintiff's favor, and that this was done in consideration of the plaintiff coming to the decedent's home and living with him, and giving up his business and home in San Francisco. To another witness, he gave as a reason for making his will in plaintiff's favor that he wanted to perpetuate his name and also his business. To still another, he said he had made his will, and had made Charlie (the plaintiff) his heir, as Charlie had given up his business interests in San Francisco and had taken his name to perpetuate his name and business. When the plaintiff, at decedent's request, had his name changed to Gall, by a judicial order, the decedent told the attorney, who attended to the matter, that " Charlie was to be his heir and assume his place in the business at his death." To his niece Rebecca Funkenstein, he said that he had made an " agreement with Charlie, that if Charlie would leave his home and remained with him he would give him everything he possessed *for changing his name*, he would leave him his business, his property and everything he possessed, excepting some few legacies that he left to my sister and brother and the three cousins in New Zealand." The plaintiff's mother testified to the same effect.

It is quite uncertain from this testimony what *precise agreement*, if any, was ever made between the plaintiff and the decedent. If there was any actual agreement between them, it is impossible to say whether the consideration therefor was the change of name, or the care which was to be given to the decedent, or the sacrifice of the California business. Then, too, if an actual agreement on the decedent's part is to be inferred from these declarations, such agreement was uncertain. There was a reservation of the right to make some legacies; and the complaint charges an undertaking " to *leave the remainder of his estate*, both real and personal," to the plaintiff. No specific property, it will be observed, but whatever he might happen to have at the time of his death, without even a general statement as to its extent, character or value. How is it possible, under well-settled rules, to enforce such an agreement were it con-

clusively established? And even if the consideration were clear, how can its adequacy be determined when the property to be ultimately realized therefor was necessarily unknown at the time the agreement was made?

Further than this, there was no binding mutuality. The plaintiff could have left the decedent at any time without violating any engagement on his part. The observations made in the House of Lords of England, in *Maddison* v. *Alderson* (8 L. R., App. Cas., 467), are pertinent on this branch of the case. There the decedent induced a woman to serve him as housekeeper, without wages, for many years, and to give up other prospects of establishment in life, by a promise to make a will leaving her a life estate in land. He, in fact, signed the will, but unfortunately for the woman it was not duly attested. It was held that there was no valid or enforceable contract. One of the law lords said that: " The case thus presented was manifestly one of conduct on the part of the appellant (affecting her arrangements in life and pecuniary interests) induced by promises of her master to leave her a life estate in the Moulton Manor Farm by will, rather *than one of definite contract, for mutual considerations,* made between herself and him at any particular time. There was certainly no contract on her part which she would have broken by voluntarily leaving his service at any time during his life, and I see no evidence of any agreement by her to serve without or to release her claim to wages. If there was a contract on his part, it was conditional upon, and in consideration of, a series of acts to be done by her, which she was at liberty to do, or not to do, as she thought fit ; and, which if done, would extend over the whole remainder of his life."

The present case is weaker for the appellant than that just cited, for here the plaintiff received a salary for his services in the decedent's business, and lived with the decedent. Further doubt is thrown upon the existence and precise nature of the alleged agreement by the affidavits upon which the application was made, in April, 1883, to change the plaintiff's name. The plaintiff there states : " That your petitioner's reasons for assuming such name are, that your petitioner is a nephew of Joseph Gall of the city of New York; that said Gall is advanced in life, and has no wife or children, and is desirous that his name be continued, and that your

petitioner should take and bear his name, that it is the name of Gall; and that said Gall *has expressed his intention to make your petitioner a legatee under his, said Gaul's, will,* if your petitioner shall take and bear his name."

The decedent, in his affidavit upon the same application, states:

"That he has no wife or children, and is desirous that his said nephew should assume and bear his name, and that on the condition of his so doing *it is his intention* to make the said Charles Funkenstein a legatee under his will."

Here we have an expression of *intention,* but not a word in either affidavit as to any agreement, much less an agreement to make the plaintiff his *residuary* legatee. Further, in the plaintiff's affidavit of October 28, 1886, presented to the surrogate, he makes this statement:

"About November 10th, 1882, I took charge of my uncle's interest in the Union Square business. I did so at the special instance and request of my uncle and aunt, who insisted that I should remain with them and give up my position in San Francisco, *and that if my conduct would merit it* they would adopt me as their son, having no children, and thus perpetuate the name of Gall, of which name and his business the old gentleman was very proud."

This statement was entirely inconsistent with the unconditional agreement set forth in the present complaint, and it throws additional doubt upon the existence of any such agreement.

These considerations would have sufficed to sustain the dismissal of the complaint, but they are reinforced by the fact of the decedent's second marriage and the existence of lawful issue. The parties, whatever their original understanding, could never have contemplated a restriction upon the decedent's right to marry or to provide for his children in case such marriage was fruitful. Nor could they have contemplated the taking, by the plaintiff, of the decedent's entire estate to the exclusion of any such future wife or child. If such an agreement had been made, it certainly would have been against public policy and void. Whatever agreement was made was necessarily subject to such possibilities and was limited by implication accordingly.

It will not, therefore, be necessary to consider the question, with

regard to the statute of frauds, as, for the reasons already given, the judgment should be affirmed, with costs.

O'BRIEN, J., concurred.

VAN BRUNT, P. J.:

I concur in the result. I do not think that the courts will enforce a contract whereby a party deprives himself of all power to bequeath or devise, by will, the property of which he is the owner at death, except in cases of adoption, where the contract is made for the benefit of an infant, and not to the exclusion of children. It will certainly not do so in a case where the agreement is unilateral and where it may be terminated by the other party at will.

Judgment affirmed, with costs.