ROSE *v.* OLIVER.
[52 Pac. 176.]

SPECIFIC PERFORMANCE — CONTRACT TO MAKE DEVISE.— A proposition that certain property shall be devised to another in consideration of certain services to be performed for the devisor during his life is not binding, and specific performance cannot be enforced, where there is no acceptance of its terms showing a mutual agreement thereto, although the proposed devisee may have voluntarily substantially complied with the terms thereof.

From Josephine: HIERO K. HANNA, Judge.

Suit by Anton Rose against Joseph R. Oliver and others to compel the specific performance of a contract alleged to have been made by the ancestor of defendants. Decree for plaintiff, and defendants appeal.

REVERSED.

For appellants there was a brief and an oral argument by *Messrs. Davis Brower* and *Henry L. Benson.*

For respondent there was a brief over the names of *Carey, Idleman, Mays & Webster, Hammond & Vawter* and *Wm. M. Colvig,* with an oral argument by *Messrs. Lionel R. Webster* and *A. S. Hammond.*

Mr. Justice Wolverton delivered the opinion.

This is a suit to require the heirs of one Antone Joseph, deceased, to specifically perform a certain contract alleged to have been entered into between plaintiff and the said Joseph, whereby Joseph agreed to make and execute a will devising and bequeathing all his property at the date of his death to the plaintiff, to the exclusion of his other heirs at law. The deceased was a Portuguese, formerly from the Island of Pico, who settled in Josephine County some years prior to 1874. The plaintiff is of the same nationality, a nephew, and went from Boston, Massachusetts, to California, in 1873, and in the following year to the home of his uncle. It is alleged, in substance, that Antone Joseph was an old man, infirm in health, peculiar and eccentric in nature and disposition, uneducated in the English language, and unacquainted with the customs and business methods of the country, which embarrassed him greatly in his business transactions; that, shortly after plaintiff's visit to him, the deceased offered and proposed that if he (plaintiff) would remain with or near him, and would render him counsel and assistance, care for him when ill, and come to him whenever he desired him so to do, he, the said Antone Joseph, would will and bequeath to plaintiff all the property, of every name and nature, that he might own at the time of his death; that plaintiff accepted said offer and proposal of the deceased, and contracted and agreed with him according to the terms thereof, and thereafter continued to reside with or near deceased, and to care for him whenever he de-

sired plaintiff's services, and remained at all times accessible, ready and willing to assist him with his counsel and advice, as well as to attend and care for him when ill or called upon for help or assistance, and did during all of said time care for, counsel and assist him whenever it was necessary, all of which services were rendered and performed solely under and in pursuance of the contract and agreement of deceased with plaintiff to execute the will aforesaid; that it was deceased's purpose and intention to execute said will, in pursuance of said contract and agreement, but that he was, on June 27, 1893, assassinated, and by reason thereof his compliance with such contract was rendered impossible.

The direct proof of the alleged contract is confined to plaintiff's narration of the conversation and events hereinafter set forth and referred to, and his iteration of the terms and conditions thereof. No other person was present at the time, or pretends to have heard or to have any personal knowledge of the direct negotiation of the parties. He testifies that he had never seen his uncle before the evening of his arrival at his ranch; that the old man was glad to see him, embraced him and shed tears; that they talked nearly all night about old friends and neighbors, and made the contract the next day. The following is his version of it, in his own language: "We got up, and he took me over the place, the ranch, and showed me the stock, some cows he had, and horses and the place. * * * Well, he showed me—I didn't say nothing about the ranch. He showed me everything, and says: 'That is a good lot of land in there, if a man could work.' I say:

'Uncle, your brothers, I think your brothers got better property than you; you ought to go home.' He says: 'No; I never go home. This to be yours. I want you to stay here, and this is to be yours. I want one of my nephews to be around with me, and that what I sent for you for. I don't get to see none of my country people, so I can write to my relatives; and I want you near to me, to kind of protect me, to have it said he had one of his relatives with him.' It wasn't for the work he wanted me. He didn't want me to work, to do anything. He didn't want me to work, but to be around, so he could hear from me and see me. * * * He made me a promise of everything he had, right there that morning. He says: 'This is all to be yours. I want you to stay around where I can hear from you and see you.' He says: 'I have got no money, and all this is to be yours. * * * I wanted one man of you to come out here. You come; you shall shall have everything I got here.'" On cross-examination, he says: "He told me that was to be mine; made me a promise right there. He says: 'You stay here, where I can see you and hear from you.' I told him I didn't think I could farm. He told me I didn't have to work. 'You stay around me where I can hear from you. I want you to stay around me, and you have all this.'" These statements of the plaintiff apparently comprise all the terms of the contract as he seems to have understood it. Other expressions of the same tenor are narrated as having been subsequently made to Rose by the old gentleman from time to time, but the contract is laid as of the date above mentioned, and the latter ex-

pressions are submitted as admissions corroborative of the existence of such contract, and not as constituting or formulating the contract itself.

In further corroboration of the contract and of the old man's intention that the nephew should have his property at his death, several witnesses were called and testified as follows: James McGarvey: "He said he intended to give everything he had when he died to Antone Rose. I don't think that was over three months before he was killed." Fremont Stackpole: "It was six years ago. * * * I said, 'Did you have a good visit with your nephew?' He said, 'Yes, sir'; and I said, 'It is a pity you can't have him stay with you; you are getting old.' And he kind of brightened up, and he says, 'When I need him, I will call him.' He says, 'He is doing well'; and he says, 'I want him to have my property, but,' he says, 'I am capable now of tending to my own affairs.'" Frank Ennis: "He said, 'When I am done, Antone [Rose] will have it.'" James Lowden: "He said: 'By the Jinks, I have got a nephew that, whenever I get sick and send for him, he comes. * * * Whenever I need him, I send for him, and he comes.' And he said when he was done, or died, his nephew got everything he had." George Anderson: "He spoke (October 18, 1892) about going back to to the old country. I says, 'What will you do with your place when you go back?' He says, 'I give it to Antone Rose.' He says (some three weeks before Joseph was killed), 'I get sick, I send for Antone Rose; * * * he come right away.' * * * He said in that conversation, the only thing I remember him saying, he said he had a 'barg' with Antone

Rose. That was all he said. What it was I don't know." H. H. Sparlin: "No; he didn't want him to come and live with him, and he made excuses, this excuse and that excuse; said he had lived so long alone that his nephew was no company to him, and he was no company to his nephew. That is about the way he expressed himself. Says he: 'I like to have everything my own way as long as I want it; and when I don't want it any longer, my nephew, he have it all his way. He get all I got, and then he have it all his way.' Says he: 'As long as I live, I want it all my way.' I talked to him frequently about making a will, but I never could get him to consent to it. It seemed he could never understand the nature of a will. He would contend with me that if he made a will, right then and there he lost everything he had. He looked at it in that light, and took that view of it, that as long as he wanted it, it was his own, and whenever he had no more use for it then it was his nephew's. That is the way he would express himself." John Lewman: "This March a year ago he was sick, and I asked him why he didn't sell out and go to his own country; and he said he couldn't do that, because he had promised everything to his nephew, and he couldn't do that." M. Chapman: "He says, 'He was the only one that ever would come to see after me,' and he didn't know anything about the rest, and he was his namesake, and he was to have all he had after he was through with it." T. G. Reames: "I asked him who his boy was, and he said it was Antone Rose. He said it was his nephew, and he wanted him

to have all the property that he had or owned at that time."

It is shown that the plaintiff remained with his uncle from May, 1874, until September, 1875, at which time he went to Galice Creek, and worked in the mines there some six months; then returned, and remained until the fall of 1876, when he went to California, where he had a sister. From there he shipped for a sea voyage of some three months, at $45 per month. He then went to Jacksonville, thence to Galice Creek, and some three weeks later returned to his uncle's place, and, after a short visit of a few days, returned to Galice Creek, where he worked steadily for eight or nine years. From there he went to the Sterling mine, and worked for Captain Ankeny six or seven years. All this time he was earning from $60 to $75 per month. Galice Creek is situated some 28 miles from where his uncle lived, and Sterling some 40 miles. He visited his uncle a few times, while employed at Galice Creek and Sterling, staying with him but a few days at each visit. Two of the visits, perhaps three, were made at his uncle's request, once or twice when he was sick, and once when he had become involved in some litigation with a neighbor. After his arrival in California from Boston, he went on a short sea voyage; and, learning upon his return, from a person of his nationality, the whereabouts of his uncle, he went to him. Before coming west he had heard through his brother that his uncle had written to his father, expressing a desire for one of his nephews to come to him. Thenceforward occurred what has been related, all of which the plaintiff says

was done in pursuance of the offer and promise of his uncle that he should have his property when he got through with it or was gone. After the death of Joseph, Rose claimed to some parties that the property was all his, but was advised that, as his uncle had left no will, it had descended to his heirs at law. At the appraisement, he made no claim to the property except a horse and some small articles which he said were given to him by his uncle. Thereafter, and before commencing this suit, he bought out the interest of one of the heirs (a cousin) for $550, and made overtures to two of his uncles to buy their interest in the estate, offering them $1,500 therefor.

Can it be said that this statement of the facts satisfactorily proves the existence of the alleged contract between Antone Joseph and the plaintiff? It is not deemed material that the proof does not show that Joseph agreed in explicit terms to make his will in favor of the plaintiff, to the entire exclusion of his other heirs at law; but the purpose would be sufficiently subserved if, by the language used, it became or was made apparent that he actually agreed that plaintiff should have his property at his death, for this would reasonably imply an agreement for a testamentary disposition in his favor. The alleged contract covered all the property which Joseph should possess at the time of his death, and was sufficiently explicit in this respect. We have looked in vain, however, for any testimony in the record showing an acceptance by plaintiff, as he avers in his complaint, of the alleged offer made by the uncle; and while the evidence shows, by a fair interpretation, an intention

of the old man to give his property to his nephew, there was clearly never any acceptance on the part of the nephew, or any agreement upon his part, to perform those things which his uncle is alleged to have required of him.   True, he says he did and performed at all times whatsoever his uncle requested of him, which constituted the conditions upon which he should obtain the old man's estate; but is this sufficient to establish the contract for the alleged testamentary disposition in favor of the nephew?  It must be conceded, for the authorities, by an almost unbroken line, settle it, that a person may make a valid agreement binding himself to dispose of his property in a particular way by last will and testament: Waterman's Specific Performance, § 41; *Johnson* v. *Hubbell,* 66 Am. Dec. 784, note.

Such an agreement must, however, endure the ordinary tests which characterize other agreements. There must be mutuality in the undertakings of the parties, and a sufficient consideration to support it. It is said that "the great criterion of a testamentary disposition is that, by intendment, it takes effect only at the death of the maker, vesting no earlier interest in the beneficiary.  And the chief and usual incident of such a disposition is that, until the maker's death, it continues ambulatory or revocable, at his discretion": Schouler on Wills, § 274.   Such a disposition of property, in its true sense, is in the nature of a gift, being voluntary and without valuable consideration; and it is because of this quality of the transaction that it is considered and so held to be revocable until title has vested by the death of the testator.   If a will be made

upon a valuable consideration, the disposition of property under it no longer partakes of the nature of a gratuity or gift. Such a will loses its revocable character, and rises to the proportions and binding force of a contract transaction. Rights are acquired by the contractual relations assumed, and henceforth the testator is without rightful authority to dispose of the subject matter of the contract otherwise than in accord with the terms and conditions settled upon and agreed to by the parties concerned. Hence, the agreement must be established by the rules governing contracts, and not by those governing wills. A will, in its true sense, as well as an expressed intention, without else to make a will in a certain manner, is revocable. But not so with a contract to make a will deliberately entered into by competent parties, upon a valuable consideration. "Such a contract, however," says BARRETT, J., in *Gall* v. *Gall*, 67 Hun, 600 (19 N. Y. Supp. 332), "especially when it is attempted to be established by parol, is regarded with suspicion, and not sustained, except upon the strongest evidence that it was founded upon a valuable consideration, and deliberately entered into by the decedent." See, also, Waterman's Specific Performance of Contracts, § 41; *Shakespeare* v. *Markham*, 72 N. Y. 400; *Drake* v. *Lanning*, 49 N. J. Eq. 452 (24 Atl. 378).

The question whether the tacit performance of the conditions contained in Joseph's offer or proposition, without having directly agreed thereto, is sufficient to the establishment of the contract, was directly considered in *Alderson* v. *Maddison*, 5 Exch. Div. 293, an English case. The facts were that the plaintiff, a

woman, had been long in the employ of decedent, who withheld her wages to a considerable amount, and induced her to continue in his service as house-keeper without wages for many years, and to give up other prospects of establishment in life by a promise to make a will leaving her a life estate in his lands. The will was in fact signed, but not attested, and therefore lacked in formality of execution to make it a perfect will. It was held by Stephen, J., that the contract was binding, because the woman had faithfully performed the services required of her until the death of decedent, but the case was reversed in the house of lords: *Maddison* v. *Alderson*, 8 App. Cas. 467. The lord chancellor said: " The case thus presented was manifestly one of conduct on the part of appellant (affecting her arrangements in life and pecuniary interests), induced by promises of her master to leave her a life estate in the Moulton Manor Farm by will, rather than one of definite contract, for mutual considerations, made between herself and him at any particular time. There was certainly no contract on her part which she would have broken by voluntarily leaving his service at any time during his life; and I see no evidence of any agreement by her to serve without, or to release her claim to, wages. If there was a contract on his part, it was conditional upon, and in consideration of, a series of acts to be done by her, which she was at liberty to do or not to do, as she thought fit, and which, if done, would extend over the whole remainder of his life." Such is the holding in *Gall* v. *Gall*, 67 Hun, 600 (19 N. Y. Supp. 332). See, also, *Drake* v. *Lanning*, 49 N. J. Eq.

452 (24 Atl. 378); *Brown* v. *Garten*, 89 Iowa, 373 (50 N. W. 537); *Davis* v. *Hendricks*, 99 Mo. 478 (12 S. W. 887); *Cessna* v. *Miller*, 85 Iowa, 725 (51 N. W. 50).

Applying the principle here deduced to the case at bar, it is hardly ascertainable how it can be said that there is any mutuality in the supposed contract. The plaintiff surely could have left the service of Joseph at any time that he had seen fit, and there would have been no breach upon his part, simply because he had not promised. If there is any contract in the case, it was made the next day after Rose arrived at his uncle's farm. But suppose Joseph had died the day following; would it have been contended for a moment that because of the conversation, without a promise on the part of Rose, he was entitled to a will at the hands of Joseph, devising and bequeathing him all his property? And yet, if there had been a valid contract entered into for the execution by the old man of his will in favor of plaintiff, it would have been just as binding then as in later years, and after the service had been performed. There was never any corresponding obligation or undertaking on the part of plaintiff to meet the offer and proposal or the alleged promise of the uncle, and we think the alleged contract is wanting in mutuality, and insufficient upon which to base a suit for specific performance.

The claim of counsel that plaintiff believed he had no such contract as he alleges to have existed is in some measure borne out by his conduct subsequent to his uncle's demise, in failing to claim the property as his under it, and in purchasing the interest of one of the heirs, and negotiating with others for the purchase

of theirs; yet this may have been induced by the advice he received touching the matter. The consideration moving from Rose in support of the contract is certainly very meager. He did some work for his uncle, but not continuously, during a period altogether of some two or two and a half years, and came to the old man's assistance on a few occasions; but he was provided with a home in the meantime, so that the gratuities of the uncle were probably of as much consequence as the services of the nephew. It does not appear that Rose ever had any other object in view, or gave up or abandoned any other purpose or enterprise for the one adopted. It is alleged that he would not have remained in this state, nor with or near his uncle, had it not been for the agreement; but the testimony does not disclose any contemplated purpose which he abandoned. It is doubtful whether such consideration was sufficient to support the alleged agreement. We rest the decision, however, upon the want of mutuality between the alleged contracting parties, and these other considerations are alluded to as strengthening that position. The decree of the court below will be reversed, and the complaint dismissed.

Reversed.