## RICHARDSON *v* ORTH.

[66 Pac. 925; 69 Pac. 455.]

WILL—CONTRACT—MUTUALITY.

1. A writing reciting that the maker, being in sound mind, "declare this to be my last will; that is, * * * . I give J. the rest of my property,"— does not constitute a contract between the parties, no obligation being assumed by either, and may be revoked by the maker.

WILL—SUFFICIENCY OF ATTESTATION.

2. The signature at the end of a purported will by witnesses will not constitute a sufficient attestation thereof when the testatrix does not indicate to them in any way what the paper is, or acknowledge that she has signed it, or that it was intended to be executed by her, the paper being so folded that the witnesses could not see any of the writing.

REQUISITES OF CONTRACT TO DEVISE—SPECIFIC PERFORMANCE.

3. In cases to enforce specific performances of an agreement to will property the evidence must show the contract to be definite, mutual, and founded upon an adequate consideration, and the proof must be clear and convincing : *Rose* v. *Oliver*, 32 Or. 447, cited.

CONTRACT TO DEVISE—SUFFICIENCY OF EVIDENCE.

4. The evidence in this case lacks the convincing quality that is necessary to establish a contract to devise property : *Rose* v. *Oliver*, 32 Or. 447, cited.

CONTRACT TO DEVISE—SUFFICIENCY OF CONSIDERATION.

5. An ᵃgreement whereby decedent was to will her estate (which amounted to about $4,000) to her stepdaughter, in consideration that the latter would live with decedent and her husband and care for the husband during his illness, is not supported by sufficient consideration to warrant specific performance, where the daughter actually cared for her father only a month, when she was relieved from her duties by his removal to other quarters, and she continued her regular occupation during the entire period.

CONTRACT TO DEVISE—STATUTE OF FRAUDS—PART PERFORMANCE.*

6. A parol agreement whereby decedent was to will her estate to her stepdaughter in consideration that the latter would live with the mother

---

*NOTE.—The following annotated cases bear on the validity of agreements to give or bequeath property to a stated person at the promissor's death : *Van Tine* v. *Van Tine*, 1 L. R. A. 155 ; *Carmichael* v. *Carmichael*, 1 L. R. A. 596, 16 Am .St. Rep. 528 , *Krell* v. *Codman*, 14 L. R. A. 860, with note. Agreement to Give Property After Death of Promissor, 26 Am. St. Rep. 260 ; *Wright* v. *Wright*, 23 L. R. A. 196 (with briefs) ; *Nowack* v. *Bergar*, 31 L. R. A. 810, 54 Am. St. Rep. 663 ; *Kofa* v. *Rosicky*, 43 Am. St. Rep. 685, 25 L. R. A. 207 (with briefs) ; *Owens* v. *McNally*, 33 L. R. A. 369 (with briefs) ; *Svanburg* v. *Fossen*, 74 Am. St. Rep. 490, 43 L. R. A. 427 (with briefs) ;

and her husband and would care for the husband during his illness, is not taken out of the statute of frauds by part performance by the daughter, where it appeared that she cared for her father for only a month, and that she continued her regular occupation during the entire time.

REASONABLE TIME FOR FILING COST BILL.

7. Cost bills should be filed in the supreme court within a reasonable time after the decision of the case, but under Rules 20, 21, and 22, providing a certain time within which parties may apply for a rehearing, and that the mandate shall not be issued until such application is disposed of, it may sometimes be that the balance of the term at which the case was decided will not be "a reasonable time" for filing the cost bill, as in this case: *State* v. *Munds,* 7 Or. 80, distinguished.

COMPLETION OF RECORDS BEFORE ISSUING MANDATE.

8. Rule 22 of this court, providing that, within sixty days after disposition of an appeal or petition for rehearing, a mandate shall issue as of course on the application of either party, does not preclude the clerk, on application being made, from filling in blanks left for the amount of costs and disbursements.

From Multnomah: JOHN B. CLELAND, Judge.

Suit by Julia C. Richardson against Bertrand Orth and others to specifically enforce a contract to will property. Decree passed for defendants, from which plaintiff appeals.

AFFIRMED.

For plaintiff there was a brief over the name of *Watson & Beekman,* with an oral argument by *Mr. Edw. B. Watson.*

For respondents there was a brief over the names of *O'Neill & Thompson,* and *Pipes & Tifft,* with an oral argument by *Messrs. Mark O'Neill,* and *Arthur P. Tifft.*

*Quinn* v. *Quinn* 49 Am. St. Rep. 875; *Bryson* v. *McShane,* 49 L. R. A. 527; *Burns* v. *Smith,* 69 Am. St. Rep. 653.

Whether a performance by the promissee of a contract to bequeath or devise property is sufficient to take the case out of the requirement of the statute of limitations is considered in the following cases:

*Pond* v. *Sheean,* 8 L. R. A. 414, with note; note to *Krell* v. *Codman,* 14 L. R. A. at p. 863; *Ellis* v. *Cary,* 17 Am. St. Rep. 125, 4 L. R. A. 55; *Shahan* v. *Swan,* 29 Am. St. Rep. 517; *Nowack* v. *Berger,* 31 L. R. A. 810, 54 Am. St. Rep. 663; *Swash* v. *Sharpstein,* 32 L. R. A. 796; *Grant* v. *Grant,* 38 Am. St. Rep. 379; *Quinn* v. *Quinn,* 49 Am. St. Rep. 875; *Dicken* v. *McKinley,* 54 Am. St. Rep. 472; *Turpinseed* v. *Sirrine,* 76 Am. St. Rep. 580.—REPORTER.

MR. JUSTICE WOLVERTON delivered the opinion.

This is a suit to enforce the specific performance of an alleged contract by and between Eleanor Richardson, now deceased, and the plaintiff, whereby the former undertook and agreed, in consideration of certain services to be rendered, to make and declare her last will and testament in favor of the plaintiff, thereby bequeathing and devising to plaintiff the whole of her estate. In May, 1877, A. B. Richardson and Eleanor Richardson, husband and wife, conveyed certain real property to F. N. Blanchet, in trust, however, for the sole use and benefit of Eleanor. Subsequently, two parcels of the realty were sold, and the proceeds, among which was a note and mortgage executed by John L. George to William H. Gross, Roman Catholic Archbishop of the Diocese of Oregon, the successor of Blanchet, so that in 1898 Eleanor's estate consisted of what remained of such proceeds—the west seventy-five feet of lot 8 in block 156 of the City of Portland, and some household furniture and wearing apparel. After reciting the foregoing facts, and others not necessary to mention, the complaint states, in substance, that on October 8, 1898, Richardson and wife being sick and infirm, the said Eleanor proposed and offered the plaintiff that if she would give up her music room and lodging at 167 Eleventh Street, in the City of Portland, and remove to her home temporarily, so as to be near her husband during his illness, and would employ her time and services whenever needed in caring for and comforting him during such illness and in attending on, caring for, and comforting her, the said Eleanor, during her apprehended illness, and in advising and assisting her in the management of her property and business affairs, she, the said Eleanor, in consideration thereof, would, by her last will, duly bequeath and devise to plaintiff all property, both real, personal, and mixed, belonging to her at the time of her death, after providing for her husband's needs and the payment of her lawful debts; that plaintiff then and there accepted said offer and proposition, and promised and agreed to and with the said Eleanor to comply with and fulfill all the terms and conditions thereof; that

the said Eleanor, then and there intending to comply with and perform said agreement, wrote out with her own hand, and caused to be attested and delivered to plaintiff, her last will and testament, in words as follows: ''I, Eleanor Richardson, being sound in mind and memory, declare this to be my last will; that is, after my lawful debts are paid, and after my husband, A. B. Richardson, is provided for, I give to Julia Richardson the rest of my property. October 8, 1898. Witness: Mrs. W. A. Pittenger, W. A. Pittenger,'' and as a part of the same transaction wrote, executed, and caused to be attested and delivered to plaintiff two orders—one upon the Society of the Holy Names of Jesus and Mary, and the other upon Mr. George—authorizing plaintiff, in case of the illness of said Eleanor, to draw what money was necessary therefor; that plaintiff received and accepted the first instrument as and for the last will and testament of Eleanor, and retained the same, together with the orders, until the time of her death, May 27, 1899, with her full acquiescence, knowledge, and consent. Performance on the part of the plaintiff is then alleged, following which it is stated that on February 20, after the death of Richardson, the plaintiff having been advised that the signature of said Eleanor to the first named instrument was requisite to its validity, so informed her, whereupon she willingly subscribed the same. The alleged contract or agreement is controverted by the answer, and for a further defense, among others, it is averred that the consideration to support it is grossly inadequate.

Several questions are presented by the record, but, in view of the conclusion we have reached, it is unnecessary to discuss more than one feature of the controversy, and that is whether there was a valid and binding agreement made and entered into by and between the plaintiff and Eleanor Richardson, whereby the latter undertook and promised to will and bequeath her property to the former; and whether, if made, it is supported by a sufficient and adequate consideration. The case rests mainly upon the plaintiff's own testimony, she being the only witness who has attempted to state the terms and conditions

of the alleged contract and agreement, and what was done by
the parties concerned in pursuance thereof. However, before
proceeding to any resume or discussion of her testimony, there
are certain uncontroverted facts that need be stated. Plaintiff
is the daughter of Richardson, and stepdaughter and niece of
Eleanor, his wife. The father and stepmother had resided
together upon the realty above described since 1877, but plain-
tiff had not lived with them for more than fourteen years.
About the nineteenth of January, 1898, Richardson was taken
sick, having been affected with paralysis, whereupon Mrs.
Richardson sent for Mrs. Mattingly, a sister of plaintiff, and
upon her advice he was taken to the hospital, where he re-
mained for three weeks. From there he was taken to Mrs.
Mattingly's, who attended upon and cared for him until about
the last days of September, when he was removed to his home,
where he remained until late in October, or early in November,
when, at the instance of Mrs. Richardson, he was again taken
to Mrs. Mattingly's, where he was attended and cared for by
her until the time of his death, February 9, 1899. Mrs. Rich-
ardson died May 27 following, at St. Vincent's Hospital.
About the time Richardson was taken home, plaintiff went to
the house at the request of Mrs. Richardson. Plaintiff testifies
that from said time until the eighth of October she helped her
father and kept house; that on the eighth her mother wrote
with her own hand the document set out in the complaint, pur-
porting to be her last will and testament, but without signing
or subscribing it; that she requested Mr. and Mrs. Pittenger
to witness it, who, without seeing the writing, the paper being
folded in such a manner as to obscure it from view, and with-
out knowledge of its contents, or being informed as to what it
was, signed their names as witnesses; that subsequently, on
February 30, 1899, after the death of Richardson, she sub-
scribed it, her attention having been by plaintiff called to the
fact that it was not signed, and that its validity was dependent
thereon, but not in the presence of the attesting witnesses.
At the time of the writing of the purported will Mrs. Richard-
son wrote two orders,—one directed to the Society of the Sis-

ters of the Holy Names of Jesus and Mary, and the other to
Mr. George,—authorizing the plaintiff, in case of her illness, to
draw whatever money was necessary for her purposes. The
last two writings were signed by Mrs. Richardson and wit-
nessed by Mr. and Mrs. Pittenger. Mrs. Richardson, her hus-
band, and plaintiff were all present at the time. It may be
stated in this connection that the Richardsons were occupying
the upper or second story of the house, and the Pittengers the
lower story, having rented the same from Mrs. Richardson.
The Pittengers moved out about the twelfth or thirteenth of
October, some four or five days after attesting the writings.

The plaintiff, being asked how these papers came to be
made, testifies: "I was up there with my stepmother. I de-
cided to go over there, and live with her. She wanted me to
be up there when papa came. She said that she had some one
who was going to help her. So I went over, and there wasn't
any one there, and she asked me if I would stay all night. I
said certainly I would stay until she could get some one, and I
did not have any idea of going up there to stay. Several days
went by, and I was busy around helping them, and my step-
mother said she would like to have me come and make my home
with papa and her. I said, of course, to do that I would have
to give up my own business and the rooms I occupied, and I
said I would have to be protected in some way if I did that;
and she said she would make over this property to me, and
that at the time she died everything would be mine, and she
explained this to me, and she said that she had this money
at the Sisters, and this note of Mr. George's, and in case she got
ill she would draw me out an order on both these places, which
she did; and then she made out this will, and gave it to me in
consideration that I would come up and make my home there;
and right then and there she wrote these papers out, and I
asked her if she hadn't better have a lawyer, and she said she
knew how to do it herself; and I showed it to father, and he
said it was all right. In a general way I was to be up there
with them, and attend to papa and herself. She didn't intend

40 OR.—17.

me to come up and do the work, but I did it until she could
get some one else, and I was to do and help around, and see
after them generally." Continuing, she states, in effect, that
she did as she agreed,—moved up and made her home there in
consequence of her mother making over the property; that
she accepted the proposition, and felt that she could, because
she knew that her mother had enough to take care of them
while she was there, and, if anything should happen, she would
have the writing to protect her, as she had given up her busi-
ness; that she had lodging and music rooms elsewhere, which
were given up after that; that she taught music at her moth-
er's, but neglected it a great deal,—just attended to it as she
could without neglecting her father and the house,—that being
her understanding of the arrangement; that she looked after
her father, helped him up and down stairs, looked after the
meals and the property generally; that, as to her mother's
business, she attended to the rent and bills for household ex-
penditures; that her mother consulted her about everything
that was going on; that nearly all of her time was taken up
with the care of her father and mother and in attending to her
mother's business; that her father remained there at the
house to the very last of October or the first of November, not
a whole month, when he was taken to her sister's; that after
that plaintiff did not remain or live with her mother, but took
rooms elsewhere with a friend; that she was to and fro visit-
ing her mother every little while, possibly once or twice a week,
until she became ill; that she did not have the further care of
her father, but visited him frequently, the arrangement with
her mother being, at the time her father went back to Mrs.
Mattingly's, in regard thereto, that she should go to and fro
and keep her posted as to how he was; that her mother became
ill about Christmas, after which she did not leave her house;
that she wanted "a nurse or some one to look after her," and
plaintiff went around to find a suitable person; that several
persons attended her during her sickness; that plaintiff did
not attend her, but visited her, as before stated, and went on
errands, and did some business for her; that she was ready to

go at all times requested, and that nearly every day she would have something to do for her.

On cross-examination she testified, in substance, that the week or ten days that she was at her mother's before the eighth of October she did everything that was necessary about the house, prepared their meals, and looked after the house; that she went there because her father was coming home, and her mother wanted her to be at the house when he came; that she was very willing to go, but did not with the expectation of staying; that she had no piano of her own, but was using one that belonged to a friend, and that when she went to her mother's she used hers. Continuing, she testified as interrogated: "Q. You say your stepmother proposed to have you stay there and work for her, and do the cooking? A. No, I don't know as she wanted me to go there and do the work, but to look after things generally, and she intended to get some one else to do the work; but at the time she hadn't any one, and I did it until she was able to get some one. Q. Your agreement with her, then, was not to do the housework? A. No, not to do the housework itself. Q. You made the agreement, if she would give you all the property, you would go there and look after things generally? A. Yes, look after things generally, and my father. Q. But not to do the housework? A. No, not especially the housework. Q. What business did your stepmother have besides the housework? A. She wasn't able to look after my father. Q. Nursing? A. He had to be assisted with his dressing and with his meals. Papa was paralyzed, and had to be helped, fed, and taken out walking, and attended off and on. Q. I asked you if the agreement was that you were to take care of him. A. Yes, and look after whatever was to be done, but not to do the housework itself. Q. Was it included in that agreement that you were to nurse him? A. Yes. Q. And assist him in putting on his clothes and caring for him? A. Yes. Q. Were you to work for her in any way besides that? A. Well, if she wanted anything done,—like attending to her bills, or having her business attended to,—she expected me to do that. Q. Did she tell you that she expected you to do that?

A. She didn't specify particularly, but the understanding was that in a general way I was to look after the house. Q. When did you make this agreement? A. On the eighth of October, at the time of this writing. Q. Was that the first time this matter was mentioned? A. Yes, that it was mentioned so seriously. Q. The first time you had a conversation about it was on the day of this writing? A. Yes. Q. Who proposed it,—you or she? A. She proposed I make my home with her. Q. Did she propose you do that for a consideration? A. Not exactly in those words. She said, 'I would like to have you come and make your home with papa and me.' I said: 'If I do that, I will have to neglect my own business. Of course, I am dependent on it for my living. If I do, you will have to protect me.' She says, 'Whatever you want me to do I will do.' I says, 'You have property and money. If during the time I am with you you should take sick yourself, you might get into a condition that you couldn't tell me where any money was. You want to fix it so I will be protected if I give up this, and come here to live.' Q. Is that the word you used? A. That is the very word I used. Q. You didn't say you would go if she gave you all the property? A. That is what I meant. I told her I would give up this teaching, not exactly give it up, but only give it up as far as it was necessary in looking after the house and papa and herself. Q. You say that payment of the grocery bills and signing the receipts for the rent was not particularly mentioned in the agreement? A. Well, I had been doing those things in a general way, and that is what I understood she meant. Q. Did she mention that particularly? A. No, I don't think she did; but I understood that was what she meant. Q. Did she mention particularly the care and nursing of your father as one of the things to do? A. Yes. I cannot remember her exact words, but that was one of the things talked about,—look after papa and her and the affairs of the house, but not to do the housework. That was the understanding. Q. And you were still to be permitted to pursue your music teaching in so far as it didn't interfere with the agreement? A. Yes."

She further states that she had not visited her parents for fourteen or fifteen years previous to the time of her father's sickness; that she was on good terms with her father, but did not fancy her mother; that the reason that he went back to her sister's was that her mother was under the impression that it was too confining in the upper part of the house; that she was very much afraid—and so was the plaintiff—that he would get injured going up and down stairs, and they thought it would be best for him to go back; that after that plaintiff had nothing to do with the caring for her father; that she looked after him less than a month; that she did not nurse her step-mother at all; that she bought things for her, and saw that she was attended to; that in November and December and subsequently she had a room with a friend of hers, and attended to her music teaching; that she did not do anything else, except to step in occasionally and visit her father, and go and see her mother; that after her mother was taken ill she did not go out of her room until she was taken to the hospital, about six weeks before she died; that she had a servant or nurse to take care of her, and that plaintiff called very often, but did not visit her so often after she was taken to the hospital. Near the close of her testimony, in answer to the question, "Was anything in the agreement you had with your aunt concerning it [money supposed to be in the hands of the sisters] that you were to work for her as you said?" She says: "Well, now, of course, when I went up there it was to make my home with her, as we both understood, until she died; and when the second agreement was made I thought probably that will would be affected by that change, and I asked her if it made any difference, and she said, 'None whatever.' She said, 'You can come and visit me, and those papers will be just the same.'" For the purpose of corroborating the plaintiff, two witnesses were called, and testified to having heard Mrs. Richardson say that she had turned over her property to Julia; and one of these, in effect, that Julia was to take care of her mother and father as long as the former lived. It is further shown that on October 25, 1898, Mrs. Richardson gave to M. L. Griffin, a thirty-day contract

for the sale of her realty; that on November 8 a sale was negotiated through him to E. J. Jaeger and T. H. Edwards, and that in furtherance of perfecting the title she, on March 29, executed a quitclaim deed to them, and had it deposited in escrow, to be delivered upon the payment of the consideration in manner as stipulated in the contract of sale; and on the thirteenth day of May, 1899, she entered into a written contract with the Sisters of Charity at St. Vincent's Hospital, whereby she agreed to pay them $1,500 in consideration that they furnish her a home, board, lodging, and medicines during the term of her natural life; and on the day before she died she made a will, as alleged in the complaint, whereby she bequeathed to plaintiff but $25.

1.    The unexecuted writing subscribed by W. A. Pittenger and wife as witnesses was at the time no doubt intended by Mrs. Richardson to constitute her last will and testament. It is not a contract in any sense of the term, as witness its terms and conditions. No obligations were assumed either by the testatrix or the plaintiff, who was made the sole residuary legatee, she being the only person concerned, save the father and husband, who was to be provided for. So far as disclosed by the instrument, the testatrix had full liberty to revoke it at any time, and the plaintiff was without power or authority to prevent or restrain her, so that the writing cannot be said to be within itself a contract between the testatrix and the plaintiff.

2.    Nor was it executed as a will as required by the statute: *Luper* v. *Werts,* 19 Or. 122 (23 Pac. 850). If the circumstance that Mrs. Richardson did not sign the writing or had not signed it at the time the witnesses subscribed it be waived, and the fact that the name Eleanor Richardson appears in the body of the will be conceded to be a sufficient signing, the evidence even then does not show a sufficient or valid attestation. True, the witnesses were requested by the testatrix to sign the paper, but she did not indicate to them in the slightest way what the paper was, or acknowledge to them that she had signed or in any manner attached her name to it, or even that

the writing was hers, or intended to be executed by her, the fact being that the paper was so folded that the witnesses could not see any of the writing, or know of its contents or purposes, or of the presence of the name of the testatrix in the body of the instrument; and this, within the doctrine of *Luper* v. *Werts*, 19 Or. 122 (23 Pac. 850), constitutes a wholly insufficient attestation, and the document cannot be, therefore, considered as an executed will. The other writings are not contracts, but merely orders to enable the plaintiff to draw money in case of her mother's illness. So that, whatever contract was made and entered into between plaintiff and her mother must be established by other evidence than these papers. Nor do we understand that plaintiff contends otherwise.

3.   But it is strenuously insisted that these papers were executed in pursuance of the contract, and as acts in carrying out its purposes, and therefore lend support to and are corroborative of plaintiff's statement as to what the real contract was. The fact of their execution is just as consistent with the nonexistence as with the existence of such a contract or agreement, so that the oral statement is not materially aided thereby. The defendants contend that the alleged agreement is within the statute of frauds, and, not being in writing, its existence cannot be established by competent proof; but, as plaintiff depends upon such a part performance in reliance upon the agreement as will take the case out of the statute in a court of equity, we must ascertain first what verbal agreement, if any, has been established, and, if any such is found to exist, then it will be time enough to determine whether the statute cuts off the remedy. "In this class of cases," says BARRETT, J., in *Gall* v. *Gall*, 67 Hun, 600 (19 N. Y. Supp. 332, 333), "the ordinary rules which govern in actions to compel the specific performance of contracts, and which furnish reasonable safeguards against frauds, should be rigidly applied. These rules require that the contract be certain and definite in all its parts; that it be mutual, and founded upon an adequate consideration; that it be established by the clearest and most convincing evidence. Even then, when the contract limits a man's right

to dispose of his property by will, it is regarded with suspicion, and enforced only when it is apparent that the hand of equity is required to prevent a fraud upon the promisee.'' The doctrine thus promulgated has the approval of this court: *Rose* v. *Oliver,* 32 Or. 447 (52 Pac. 176). A fair statement of the reciprocal obligations between the parties may be gathered from the plaintiff's examination in chief, which is about as follows: She consented to give up her present lodging and music rooms, and live with her father and mother, and agreed to attend to and take care of her father during his sickness, to attend to and care for her mother, consult with and assist her in the management of her business affairs, but not to do the housework, and engage in her occupation of teaching music in subordination to the demands upon her time by her newly-assumed duties; and that the mother, upon the other hand, was to make over and give up all her property, so that everything would belong to the plaintiff at the time of her death. The testimony of the two witnesses referred to above would seem, in some measure, to corroborate this statement; but when we come to a consideration of the cross-examination and the future conduct of the parties we are led to conclude that such an agreement was never entered into.

4. Let us recount what was done. The mother attempted to make a will devising to plaintiff all her property; gave orders intended to enable Julia to obtain money to defray expenses for the mother's illness, and these documents were at once delivered into the hands of the plaintiff. The father remained at his home scarcely four weeks, during which time plaintiff had the care of him; but subsequently she did nothing, except to visit him frequently, and tell her mother of his condition, and transact such matters of business as paying butcher and grocery bills and the like, under the direction of her mother. The mother contracted with Griffin for the sale of her house and lot, and through him entered into a contract with Jaeger and Edwards, obligating herself to make a deed to them; subsequently made a quitclaim deed to them in furtherance of a clear title; had it deposited in escrow, depending for

its delivery upon the payment of the consideration; made arrangements with St. Vincent's Hospital for her care and attention while sick; contracted with the Sisters for a consideration of $1,500, to be paid out of her estate, to furnish her with a home, board, lodging, and medicines during her natural life; and, finally, made a will disposing of her property entirely different from that designed by the attempted will of October 8,—and all this without consulting or advising with the plaintiff about any of the matters of business thus transacted. These acts are all inconsistent with the idea of a contract or agreement on her part to make over the property to the plaintiff. True, the mother could, if she had so desired, willfully have disregarded her solemn obligations; but the presumption is that a person acts in discharge of his bounden duty, rather than in disregard thereof, and so it is here we must take it that Mrs. Richardson was acting as she supposed it was her right to do. Ordinarily, persons have the right to revoke all prior wills, and dispose of any property they may possess, and all these acts of the mother are perfectly consistent with this idea. The plaintiff, while she gave up her separate lodgings, did not give up her music. She carried on her instructions while at her parents', and when her father went away she again took rooms elsewhere, and continued her instructions as before, so that she abandoned nothing of her former occupation in going to live with her parents. Indeed, the arrangement seems to have been suggested more by filial relations than as the result of a coldly-calculated business scheme with a view to a purchase of her mother's property. We say ''purchase,'' because the alleged statement, if true, would amount to a contract of purchase, and this suit is instituted to enforce a specific performance of it. Plaintiff's restatement on cross-examination is not so clear, and almost at the close she says: ''Well, now, of course, when I went up there, it was to make my home with her, as we both understood, until she died; and when the second arrangement was made [this has reference to the time her father went back to her sister's] I thought probably I would be affected by the change, and I asked her if it made any

difference, and she said, 'None whatever. * * * You can come and visit me, and these papers will be just the same.'"
These acts and this latest statement of the plaintiff would seem to indicate that the mother at the time was desirous that the plaintiff should come and live with them, and had made up her mind to make her will bequeathing and devising to plaintiff all her property, so that she should have it at her death, expecting at the same time that plaintiff would be a comfort and help to both her and the father, and of assistance in the care and management of her minor business affairs, and that in consonance with this idea the will was attempted to be executed, and these orders given, and that what the plaintiff did was in obedience to her mother's wishes, and this is all there was of the alleged agreement. There were no reciprocal obligations made or entered into between them, and the mother, therefore, had the right and authority to subsequently dispose of her property as she saw fit. This is the most reasonable and consistent deduction from the acts and transactions of the parties that we are enabled to make, and at the farthest we cannot say the alleged contract or agreement is established by that clear and convincing evidence which is required in such a case.

5. There is another feature of the case that pertains to the adequacy of the consideration to support the alleged contract. Plaintiff served in taking care of her father less than four weeks. Practically speaking, she gave up nothing of her plans to do it,—that is, she continued her occupation as before,—at the end of which time she states that another arrangement was made, or the first modified, so that she was relieved entirely of the care of her father. She continued to assist her mother somewhat in the transaction of her smaller business concerns, but this is of little moment. Now, if it be conceded that the original agreement was that she should attend to and care for her father to the end of his days, she was by the later, or modified, arrangement relieved of that, so that it left scarce four weeks' service to stand as the consideration for an estate of the value of $4,000, soon to come into her possession. It is at once

apparent that such a consideration is wholly inadequate to uphold the alleged undertaking. Surely, the hand of equity is not required to prevent a fraud upon the promisee.

6. The plaintiff has expended so little of her time in the care of her father—a duty that she owed him out of filial considerations—that it is not only inadequate as a consideration, but entirely insufficient as part performance to take the case out of the statute of frauds.

These considerations are supported by *Rose* v. *Oliver*, 32 Or. 447 (52 Pac. 176); *Shakespeare* v. *Markham*, 72 N. Y. 406; *Maddison* v. *Alderson*, 8 App. Cas. 467; and other cases cited in the first named authority, and affirm the decree of the court below.    AFFIRMED.

Decided 7 July, 1902.

ON OBJECTION TO TAXING COSTS.

*Mr. E. B. Watson*, objecting.

*Mr. M. L. Pipes, contra.*

MR. JUSTICE WOLVERTON delivered the opinion.

A decree was rendered in this case December 16, 1901, affirming the action of the trial court, and a petition for a rehearing denied during the following March term of the court: 66 Pac. 925. When the decree was entered the usual blank was left by the clerk for the amount of costs and disbursements, when settled and taxed. On May 9, and within sixty days from the denial of the petition for rehearing, appellant made application to the clerk for a mandate, whereupon he notified the respondent's attorneys of their omission to file a cost bill, and withheld the mandate in the meanwhile. On the next day (May 10) respondents served a cost bill, and filed the same two days later, to the allowance of which in any form the appellant objected, and the matter is brought here for determination.

Two reasons are assigned in support of the objection: (1) That the cost bill was not filed within a reasonable time after

the rendition of the decree; and (2) it was not presented for filing until after the mandate had been applied for, which, it is contended, should have been issued at once, as a matter of course, without the costs being inserted therein.

7. Under the statute the prevailing party may file his cost bill within five days after the entry of the judgment or decree, but, if delayed beyond that period, a copy must be served upon the opposite party; and no limit has been prescribed within which this may be done: Hill's Ann. Laws, § 556. Under the adjudication in *State* v. *Munds*, 7 Or. 80, it should be within a reasonable time, and the court say: ''What would be a reasonable time may depend upon the circumstances of each particular case, but in no case would it be within a reasonable time to prolong the taxation beyond the commencement of the next ensuing term of the court.'' That was a question of taxation in the circuit court, and in a criminal case, where it was the duty of the clerk to attend to the ascertainment and taxation of such costs and disbursements. The conditions are somewhat different in this court. Under the rules a party has twenty days from the rendition of the judgment or decree to file a motion for rehearing, and if filed within the time, or any extension made by order of the court, no mandate can issue until disposed of. But when disposed of, it may issue as of course, upon the application of either party, within sixty days. Thereafter it can only issue by an order of the court: Rules 20-22 (37 Pac. ix.). The costs and disbursements being but an incident of the judgment or decree, it has been the custom of the clerk to leave a blank for their insertion when taxed and settled, leaving such judgment or decree incomplete in this respect. It has also been his custom to notify the appropriate party, when a mandate is called for, of the want of a cost bill, that he may have an opportunity of correcting the oversight. Under the rules and the practice, we are not prepared to say that an unreasonable time elapsed before the cost bill was served and filed, although done at the succeeding term of the court. The petition for rehearing had not been

disposed of before the beginning of the term, so that the matter had not then passed beyond the control of the court.

8. As to the second cause of objection, the appellant had a right to have the mandate issue as of course (that is, without the necessity of an order of the court), having made application for it within sixty days, but such application did not preclude the clerk from completing the record before issuing the mandate. His notice or request of the respondent's attorneys was for information to enable him to do this by inserting in the decree the amount of the costs and disbursements. This he did, under a custom of long standing, and, as it has not resulted in any injury to the defendant, the objection is without merit, and must be overruled. The costs and disbursements as stated in the cost bill will therefore be taxed and inserted in the decree, whereupon the mandate will issue.

AFFIRMED; OBJECTIONS OVERRULED.

Decided 16 August, 1901.